# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Lonnie Thompson,** | **Case No. 1:23-cv-1656-PAB** |
| **Plaintiff,** | **JUDGE PAMELA A.** |
| **-vs-** | **BARKER** |
| **Julie Hensley, et al.,** | **MEMORANDUM** |
| | **OPINION & ORDER** |
| **Defendant.** | |

Currently pending before the Court is the Motion to Dismiss of Defendants Julie Christine Hensley ("Hensley"), Kendra Lynn Newland ("Newland"), (3) Ifeoma Ada Chinweoke Ojukwu ("Dr. Ojukwu"), Kelli Cardaras ("Cardaras"),[1] Rachael Elizabeth Wheeler ("Wheeler"), and Sherry Lynn Cornwell ("Cornwell") (together, "Defendants"), filed on April 25, 2025 ("Defendants' Motion"). (Doc. No. 70.)  On June 24, 2025, Plaintiff Lonnie Thompson ("Plaintiff" or "Thompson") filed a Brief in Opposition to Defendants' Motion ("Thompson's Opposition").  (Doc. No. 74.)  On June 26, 2025, Defendants filed a Motion to Strike and Reply Brief in support of Defendants' Motion ("Defendants' Reply")  (Doc. No. 21.)

For the following reasons, Defendants' Motion is **GRANTED IN PART AND DENIED IN PART**.  The Court dismisses Defendants Hensley, Newland, Dr. Ojukwu, Wheeler, and Cornwell, but declines to dismiss Defendant Cardaras.

---

[1] The Amended Complaint refers to Kelli Cardaras as "Cadaras," but the Court refers to her as "Cardaras," which is the name used in Defendants' Motion.  (*Compare* Doc. No. 57 at PageID# 412 *with* Doc. No. 70 at PageID# 479.)

## I.     Background

### A.     Factual Allegations

The allegations set forth in Thompson's Amended Complaint span Thompson's incarceration at three different correctional facilities: the Mansfield Correctional Institute from October 2021 to October 2022; the Ross Correctional Institution from October 2022 to August 2023; and at the Richland Correctional Institute thereafter,[2] all of which, according to Thompson, are under the control of the State of Ohio.  (Doc. No. 57 at PageID# 407.)  Thompson alleges that he "has been diagnosed with bladder and prostate cancer" and that he "has a previously diagnosed significant health and medical issue."  He does not allege when these diagnoses were rendered.  (*Id.*)  Thompson also alleges that "[t]he State of Ohio failed to provide Thompson with reasonable adequate care while he was in custody."  (*Id.* at PageID# 408.)

In addition to these general allegations, the Amended Complaint sets forth the following separate allegations as to each named Defendant.

### 1.     Hensley

The State of Ohio "provided Hensley authority to perform her duties" as "a registered nurse" at the Mansfield Correctional Institute and the State of Ohio provided her with authority to perform her duties.  (*Id.* at PageID# 408.)  "Between the dates of approximately October 4, 2021 and October 14, 2022, … in her personal capacity, [Hensley] violated Thompson's Eighth and Fourteenth Amendment right to be free of cruel and unusual punishment."  (*Id.*)  "Between the aforementioned approximate dates Hensley was the healthcare administrator at the Mansfield Correctional institute."  (*Id.*)  According to Thompson, Hensley "either was aware or should have been aware that Thompson

---

[2]  Thompson currently resides at the Trumbull Correctional Institution in Levittsburg, Ohio.  (Doc. No. 76.)

was continuously experiencing bloody and painful urinations, having urinary tract infections, that urine tests indicated high levels of blood, protein, and ketones, and that Thompson had numerous nurse and doctor sick calls complaining of the above, among other issues." (*Id.*) Thompson alleges that "a referral was made for a transurethral resection of the prostate procedure, before later being rejected by the ODRC" but does not indicate when this referral was made. (*Id.* at PageID# 409.) According to Thompson, Hensley "was aware or should have been aware of the referral and rejection." (*Id.*) Thompson alleges that "Hensley acted with deliberate indifference because she knew, or should have known, that this referral should have been approved, and that the denial created risks based on Thompson's symptoms known to Hensley, but refused to take any action to verify this fact and did not take any action to remedy the rejection." (*Id.*) Thompson also alleges that Hensley "informed Thompson's family that the only health problem that Thompson had was urinary tract infections[,]" and "directed derogatory statements towards him such as telling him he was anal retentive." (*Id.*) According to Thomspon, Hensley's "actions and lack of prompt action caused Thompson unnecessary pain and suffering" and "delayed Thompson's cancer treatment and caused harm." (*Id.*)

### 2. Newland

The State of Ohio "provided Newland authority to perform her duties" as "a nurse practitioner compensated either directly or indirectly through a privately contracted third party, by the State of Ohio" while Thompson was incarcerated at the Mansfield Correctional Institute. (*Id.* at PageID# 409.) According to Thompson, "[b]etween the dates of approximately October 4, 2021, and October 14, 2022, … Newland, in her personal capacity, violated Thompson's Eighth and Fourteenth Amendment right to be free of cruel and unusual punishment. (*Id.* at PageID # 410.) She "either was

aware or should have been aware that Thompson was continuously experiencing bloody and painful urinations, having urinary tract infections, and experiencing painful bowel movements, and that urine tests indicated high levels of blood, protein, and ketones, and that Thompson had numerous nurse and doctor sick calls complaining of the above, among other issues, within a six month window of time." (*Id.*)[3]  According to Thompson, "Newland prescribed Bactrim and other antibacterial medications to [him]" but "[t]hese prescriptions did not alleviate [his] conditions."  (*Id.*)

Thompson alleges that Newland "informed [him] that she did not believe that he had cancer." (*Id.*)  According to Thompson, "Newland acted with deliberate indifference because she knew, or should have known, that the antibacterial drugs she prescribed were not working, but refused to verify this fact and kept prescribing drugs that were not working regardless of the associated risks of a more serious condition that she knew existed."  (*Id.*)  According to Thompson, Newland's "actions and lack thereof prompt action caused Thompson unnecessary pain and suffering" and "delayed Thompson's cancer treatment and caused harm." (*Id.*)

### 3. Dr. Ojukwu

The State of Ohio "provided [Dr.] Ojukwu authority to perform his duties" as "a doctor of medicine (MD) who was compensated either directly or indirectly through a privately contracted third party by the State of Ohio" while Thompson was incarcerated at the Mansfield Correctional Institute. (*Id.* at PageID#s 410-11.)  According to Thompson, "[b]etween the dates of approximately October 4, 2021, and October 14, 2022, … [Dr.] Ojukwu, in his personal capacity, violated [his] Eighth and Fourteenth Amendment right to be free of cruel and unusual punishment."  (*Id.* at PageID# 411.)

---

[3] As distinguished from Thompson's allegations against Hensley, his allegations against Newland also include that Newland was aware that Thompson was "experiencing painful bowel movements"; and that Thompson had been experiencing the referenced maladies "within a six month window of time."  (*Id.*)

4

Thompson alleges that Dr. "Ojukwu either was aware or should have been aware that Thompson was continuously experiencing bloody and painful urinations, having urinary tract infections, experiencing painful bowel movements, that urine tests indicated high levels of blood, protein, and ketones, and that Thompson had numerous nurse and doctor sick calls complaining of the above, among other issues.  (*Id*.)  He "either was aware or should have been aware that drugs such [as] Bactrim were not alleviating Thompson's symptoms over an extended period of time."  (*Id*.)

"On one occasion [Dr.] Ojukwu referred Thompson to a specialist for a transurethral resection of the prostate procedure" but "[t]his referral was denied."  (*Id*.)  According to Thompson, Dr. Ojukwu "acted with deliberate indifference because he knew, or should have known, that a referral to specialists was necessary, but refused to verify this fact" and "[h]e did not take any action to remedy the rejection regardless of the associated risks of a more serious condition that he knew existed."  (*Id*.) Thompson alleges that Dr. Ojukwu's "actions and lack thereof prompt action caused Thompson unnecessary pain and suffering" and "delayed Thompson's cancer treatment and caused harm."  (*Id*.)

### 4.    Cardaras

The State of Ohio "provided Cardaras  authority to perform her duties" as "a nurse practitioner who was compensated either directly or indirectly through a privately contracted third party, by the State of Ohio" while Thompson was incarcerated at the Ross Correctional Institution.  (*Id*. at PageID# 412.)  "Between the dates of approximately October 14, 2022, and August 2, 2023, … Cardaras, in her personal capacity, violated Thompson's Eight[h] and Fourteenth Amendment right to be free of cruel and unusual punishment."  (*Id*.)  "Cardaras was aware that Thompson was reporting continuous pain in his groin and lower stomach area."  (*Id*.)  According to Thompson, Cardaras was also "aware that Thompson received treatment from surgeons, urologists, and oncologists at The Ohio State

University Hospital." (*Id.*)  That treatment "included orders for continued treatment with Ensure ordered to facilitate Thompson's weight gain and Oxybutynin/Ditropan to treat bladder spasms, and potentially other medications unknown to Thompson." (*Id.*)  However, according to Thompson, "Cardaras denied Thompson access to Ensure, Oxybutynin/Ditropan, and potentially other ordered medications, in direct contradiction to orders from surgeons, urologists, and oncologists at The Ohio State University Hospital." (*Id.*)

Thompson alleges that "Cardaras acted with deliberate indifference because she refused to follow and carry out medical orders" and because "she knew, or should have known, that treatments and medications ordered by specialists were necessary, but refused to verify this fact and ignored orders from specialists regardless of the associated risks that she knew existed as a result of ignoring these orders." (*Id.* at PageID#s 412-13.)  According to Thompson, Cardaras's "actions caused Thompson unnecessary pain and suffering" and "caused Thompson harm." (*Id.* at PageID# 413.)

### 5. Wheeler

The State of Ohio "provided Wheeler authority to perform her duties" as "a nurse practitioner who was and is compensated, either directly or indirectly through a privately contracted third party, by the State of Ohio" while Thompson was incarcerated at the Richland Correctional Institute. (*Id.* at PageID# 413.)  "Between the dates of [] approximately October 2023, and the present date, … Wheeler, in her personal capacity, violated Thompson's Eight[h] and Fourteenth Amendment right to be free of cruel and unusual punishment." (*Id.*)  "Wheeler is, or should have been, aware that Thompson has cancer" and "is, or should have been, aware that Thompson continues to experience urination complications, lower back pain, stomach pain, and abdominal pain." (*Id.*)

6

Thompson alleges that his "treatment at The Ohio State University Hospital included orders from specialists for continued treatment with Ensure and Ultram/Tramadol." (*Id.*) "Wheeler was aware, or should have been aware, of medical orders from specialists" but she "denied Thompson access to these medications." (*Id.* at PageID# 414.) "Wheeler denied Thompson access to Ensure because Thompson's weight was not below an undefined level and there was no generic alternative readily available" and "denied Thompson access to Ultram/Tramadol and instead provided Tylenol." (*Id.*) However, "Wheeler was aware, or should have been aware, that the dietician at the Richland Correctional Institute was attempting to follow the same medical orders that she (Wheeler) was refusing to follow." (*Id.*)

According to Thompson, "Wheeler acted with deliberate indifference because she refused to follow and carry out medical orders" and "because she knew, or should have known, that treatments and medications ordered by specialists were necessary, but refused to verify this fact and ignored orders from specialists regardless of the associated risks that she knew existed as a result of ignoring these orders." (*Id.*) Thompson also alleges that "[d]uring another incident Thompson informed Wheeler that he had a lump on his left testicle" but she "did not examine the lump and refused to authorize a sonar gram." (*Id.*)

Thompson's allegations against Wheeler do not include an allegation that her actions caused Thompson to suffer any harm.

### 6.     Cornwell

The State of Ohio "provided Cornwell authority to perform her duties" as "a nurse practitioner who was and is compensated, either directly or indirectly through a privately contracted third party, by the State of Ohio" while Thompson was incarcerated at the Richland Correctional Institute.  (*Id.*

7

at PageID# 414.) "Between the dates of between approximately October 2023, and the present date, … Cornwell, in her personal capacity, violated Thompson's Eighth and Fourteenth Amendment right to be free of cruel and unusual punishment." (*Id.* at PageID # 415.) According to Thompson, "Cornwell is or should have been, aware that Thompson has cancer" and that Thompson "continues to experience urination complications, lower back pain, stomach pain, and abdominal pain." (*Id.*) Thompson's "treatment at The Ohio State University Hospital included orders from specialists for continued treatment with Ensure and Ultram/Tramadol." (*Id.*) "Cornwell was aware, or should have been aware, of medical orders from specialists" but she "denied Thompson access to these medications." (*Id.* at PageID# 414.)[4] However, "Wheeler was aware, or should have been aware, that the dietician at the Richland Correctional Institute was attempting to follow the same medical orders that she (Wheeler) was refusing to follow." (*Id.*)

According to Thompson, "Cornwell acted with deliberate indifference because she refused to follow and carry out medical orders" and "because she knew, or should have known, that treatments and medications ordered by specialists were necessary, but refused to verify this fact and ignored orders from specialists regardless of the associated risks that she knew existed as a result of ignoring these orders." (*Id.*)

Like his allegations against Wheeler, Thompson's allegations against Cornwell do not include any allegation that her actions caused Thompson to suffer any harm.

---

[4] As distinguished from his allegations against Wheeler, Thompson's allegations against Cornwell do not include any reason(s) why Cornwell allegedly denied Thompson access to Ensure and Ultram/Tramadol. (*Compare id.* at PageID# 415 *with id.* at PageID# 415.)

### B.      Procedural History

Thompson, proceeding *pro se*, filed his Complaint in this Court on August 25, 2023.  (Doc. No. 1.)  On May 28, 2024, the Court appointed Attorney Joseph T. Sobecki as pro bono counsel for Thompson.  (Doc. No. 23.)  On January 10, 2025, Thompson, through counsel, filed his Amended Complaint.[5]  (Doc. No. 57.)  On March 3, 2025, the Court granted Sobecki leave to withdraw as Thompson's counsel.  (Doc. No. 60; Entry of Mar. 3, 2025.)

In his Amended Complaint, Thompson asserts a deliberate-indifference claim under 28 U.S.C. § 1983 against each of the named Defendants, in their personal capacities, for violating his right to be free from cruel and unusual punishment under the Eighth Amendment and the Fourteenth Amendment.  (Doc. No. 57 at PageID#s 408-16.)  On April 25, 2025, Defendants' Motion was filed. (Doc. No. 70.)  On June 24, 2025, Thompson's Opposition was filed.  (Doc. No. 74.)  On June 26, 2025, Defendants' Reply was filed.  (Doc. No. 21.)

## II.      Standard of Review

In order to survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain (1) 'enough facts to state a claim to relief that is plausible,' (2) more than 'formulaic recitation of a cause of action's elements,' and (3) allegations that suggest a 'right to relief above a speculative level.'"

---

[5] The court notes that although Thompson is now proceeding *pro se*, he proceeded with counsel when he filed the Amended Complaint.  Thus, because Attorney Joseph Sobecki prepared Thompson's Amended Complaint (*see* Doc. No. 57 at PageID# 416) (indicating that Attorney Sobecki signed the Amended Complaint), this pleading is not entitled to a "liberal construction."  *See Bickerstaff v. Cuyahoga Cnty.*, 2019 WL 7500494 at *5 (N.D. Ohio Aug. 12, 2019) (citing *Crosby v. S. Carolina Dep't of Pub. Safety*, 2017 WL 398352 at *2 (D.S.C. Jan. 30, 2017), *aff'd*, 691 Fed. Appx. 783 (4th Cir. 2017)) ("Complaints that were drafted by an attorney are not entitled to liberal construction merely because the plaintiff later assumed *pro se* status."); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) (explaining that "a pro se complaint, however inartfully pleaded, must be held to less stringent standards than *formal pleadings drafted by lawyers*") (cleaned up and emphasis added). This pleading was "drafted by [a] lawyer[]", so the "less stringent standards" will not be applied in evaluating Defendants' Motion.  *Id.*

*Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (quoting in part *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).

The measure of a Rule 12(b)(6) challenge—whether the Complaint raises a right to relief above the speculative level—"does not 'require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face.'" *Bassett v. National Collegiate Athletic Ass'n.*, 528 F.3d 426, 430 (6th Cir.2008) (quoting in part *Twombly,* 550 U.S. at 555–56). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Deciding whether a complaint states a claim for relief that is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679.

Consequently, examination of a complaint for a plausible claim for relief is undertaken in conjunction with the "well-established principle that 'Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (quoting in part *Erickson v. Pardus*, 551 U.S. 89 (2007)). Nonetheless, while "Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 679.

### III.    Analysis

Defendants argue that the Court should dismiss Thompson's § 1983 deliberate indifference claims for three reasons: (1) Defendants are entitled to qualified immunity because they did not violate Thompson's clearly established rights; (2) even if they are not entitled to qualified immunity, the Complaint fails to allege Eighth Amendment violations; and (3) Defendants are entitled to dismissal because *respondeat superior* does not apply to § 1983 claims.  (Doc. Nos. 70, 75.)

The Court proceeds as follows. In Section III.A, the Court first outlines the applicable principles for qualified immunity and Eighth Amendment Rights violations, and then proceeds to apply them to each Defendant.  The Court ultimately concludes that Hensley, Newland, Dr. Ojukwu, Wheeler, and Cornwell are entitled to qualified immunity, but that Cardaras is not.   In Section III.B, the Court addresses Defendants' *respondeat superior* defense and rejects it as an alternate basis for dismissing Thompson's claim against Cardaras.

### A.    Qualified Immunity

Defendants assert that they are entitled to qualified immunity. They contend that Thompson's allegations do not "show that he had a constitutional right so clearly established in a particularized sense that Defendants reasonably should have known that their personal conduct violated said purported constitutional right."  (Doc. No. 70 at PageID# 492.)  According to Defendants:

> [They] conducted numerous nurse and doctor sick calls, prescribed numerous medications, made referrals for procedures, coordinated with a urologist for procedures and conducted testing.  None of Plaintiff's allegations support any claim that his cancer was the proximate cause of Defendants purported deliberate indifference.  Instead, Plaintiff has a mere disagreement about Defendants' abundant treatment of his constant urinary tract infections.  As such, the Plaintiff has not alleged any causal connection between the two.

11

(*Id.*)  In his Opposition, Thompson conclusorily responds that "[t]he Defendants are not immune for the violations of the plaintiff's Constitutional rights to be free of cruel and unusual punishment in their individual capacity" but he does not elaborate on the reasons for his conclusion.[6]  (Doc. No. 74 at PageID# 531.)  Defendants do not discuss qualified immunity in their Reply.  (*See generally* Doc. No. 75.)

Under the doctrine of qualified immunity, "courts may not award damages against a government official in his personal capacity unless 'the official violated a statutory or constitutional right,' and 'the right was "clearly established" at the time of the challenged conduct.'"  *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).  In evaluating qualified immunity at the pleading stage, the Court must determine whether the complaint plausibly alleges facts showing that (1) the government official violated a plaintiff's constitutional rights, and (2) that this right was clearly established at the time of the violation.  *See Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020); *see also Saalim v. Walmart,* 97 F.4th 995, 1003 (6th Cir. 2024); *Kerchen v. Univ. of Michigan*, 100 F.4th 751, 761 (6th Cir. 2024).  "If, taking all the facts as true and reading all inferences in the plaintiff's favor, the plaintiff has not plausibly show[n] a violation of his clearly established rights, then the [official] is entitled to immunity from suit."  *Id.*; *see also Crawford*, 15 F.4th at 766.

For a law to be "clearly established," it must be so clear at the time of the incident that every reasonable official would understand the unlawfulness of his conduct.  *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  As the Supreme Court explained:

---

[6] Thompson also includes a conclusory contention in a declaration attached to his Opposition that "none of the defendants are entitled to . . . immunity due to the facts presented within the complaint and the Memorandum in Support of the Plaintiff's Opposition to Dismiss."  (Doc. No. 74-1 at PageID# 533.)

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (*per curiam*), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,'" *al-Kidd, supra*, at 741-42 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S. at 666. Otherwise, the rule is not one that "every reasonable official" would know. *Id.* at 664.

The "clearly established" standard also requires that the legal principle clearly prohibit the [official's] conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. 7, 13 (2015) (*per curiam*). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff* [*v. Rickard*, 572 U.S. 765, 779 (2014)]. A rule is too general if the unlawfulness of the [official's] conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson* [*v. Creighton*, 483 U.S. 635, 641 (1987)].

*Id.* at 63-64 (cleaned up). Thus, in evaluating whether a constitutional right was clearly established for purposes of qualified immunity, courts "must examine the *particular* situation that [the official] confronted and ask whether the law clearly established that [his] conduct was unlawful." *Howse v. Hodous*, 953 F.3d 402, 407 (6th Cir. 2020). "When a deliberate indifference claim intersects with a qualified immunity defense, courts must be clear in their analyses: a defendant cannot be 'deliberately indifferent' to a right that is not clearly established." *Bailey v. Washington*, 2023 WL 5511181 at *4 (E.D. Mich. Aug. 25, 2023). In reading a complaint in the light most favorable to the plaintiff, it need only be "plausible" that an official's acts violated the plaintiff's clearly established constitutional right. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

Finally, "[c]ourts may address either of the qualified-immunity standard's two prongs first, and need not address the second if the first is dispositive." *McKnight v. Cortez*, 2025 WL 951946 at

*5 n.5 (W.D. Ky. Mar. 28, 2025) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2006)); *see also Burghardt v. Ryan*, 560 F. Supp. 3d 1093, 1104 (N.D. Ohio 2021) (Lioi, J.), *aff'd*, 2022 WL 1773420 (6th Cir. June 1, 2022) ("Since the failure of either prong is dispositive in favor of a defendant, the Court may address either prong first.").

### 1.      Eighth Amendment Deliberate Indifference Standard

The Eighth Amendment protects an individual from "cruel and unusual punishments."  U.S. Const., amend. VIII.  The Supreme Court has held that a government official violates an incarcerated person's Eighth Amendment rights when the official shows "deliberate indifference to serious medical needs."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *see also Murray v. Ohio*, 29 F.4th 779, 786-87 (6th Cir. 2022).  An inmate can bring suit under § 1983 for an Eighth Amendment violation "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."  *Id.*; *see also Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 895 (6th Cir. 2004).

Deliberate indifference claims under the Eighth Amendment have both an objective and a subjective component.  *See Murray*, 29 F.4th at 786; *Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021); *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018); *Blackmore*, 390 F.3d at 895. The objective component requires that the deprivation of medical treatment be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991); *see also Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Sixth Circuit has held that a "sufficiently serious" medical need is a medical condition that has been "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Santiago v. Ringle*, 734 F.3d

14

585, 590 (6th Cir. 2013); *see also Phillips*, 14 F. 4th at 534; *Rinehart*, 894 F.3d at 737. "The Sixth Circuit recognizes that '[i]mplicit in [the deliberate indifference] standard is the recognition that the plaintiff must allege that he has suffered or is threatened with suffering actual harm as a result of the defendants' acts or omissions before he can make any claim with an arguable basis in Eighth Amendment jurisprudence." *Heid v. Hooks*, 2020 WL 5201082 at *6 (S.D. Ohio Sept. 1, 2020) (quoting *Wilson v. Yaklich*, 148 F.3d 596, 601 (6th Cir. 1998)).

The subjective component requires a prisoner to demonstrate that prison officials had a "sufficiently culpable state of mind" in denying him medical care. *Wilson*, 501 U.S. at 297; *see also Est. of Majors v. Gerlach*, 821 Fed. Appx. 533, 541 (6th Cir. 2020) (hereinafter, "*Majors*"). "Under [Sixth Circuit] case law, [this] means 'something more than mere negligence,' but may be shown 'by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Majors*, 821 Fed. Appx. at 541 (quoting *Farmer*, 511 U.S. at 835). Ultimately, a prison official must have known of and disregarded "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. The official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [s]he must also draw the inference." *Id.* The Sixth Circuit has emphasized that "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn by Parks v. Madison Cnty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994); *see also Blackmore*, 390 F.3d at 896; *Majors*, 821 Fed. Appx. at 541. A prison official can escape liability by showing that they "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.[7]

---

[7] Thompson is not a pretrial detainee. Pretrial detainees bring claims under the Fourteenth Amendment, not the Eighth Amendment, so the subjective component standard applicable to Thompson's claims has not been modified by *Brawner*

15

### 2.      Application to Individual Defendants

The Court now proceeds to evaluate each Defendant's qualified immunity defense.[8]  For the reasons more fully explained below, the Court finds as follows:  1.) Hensley and Dr. Ojukwu are entitled to qualified immunity because Thompson failed to point to any clearly established Eighth Amendment right that Hensley and Dr. Ojukwu allegedly violated; 2.) Newland is entitled to qualified immunity because the Amended Complaint fails to plausibly allege the subjective component of the Eighth Amendment inquiry; 3.) Wheeler and Cornwell are entitled to qualified immunity because the Amended Complaint fails to plausibly allege the objective component of the Eighth Amendment inquiry; and 4.) Cardaras is not entitled to qualified immunity because the allegations against her state a plausible claim that she violated Thompson's clearly established constitutional rights.

#### a)      Hensley

Hensley claims that "nowhere does the Complaint allege any facts suggesting that [she] was personally respsonsible for any action or wrongdoing that injured" Thompson.  (Doc. No. 70 at PageID# 480.)  Hensley (and Newland, Dr. Ojukwu, and Cardaras) point to Thompson's allegations regarding his "numerous health provider visits, the medications that were given him, and the recommendation that he be referred to a specialist for further treatment of his urinary tract symptoms,

---

v. Scott Cnty., 14 F.4th 585, 591 (6th Cir. 2021).  *See Sturgill v. Mutrespaw*, 2024 WL 3925663 at *6 (S.D. Ohio Aug. 22, 2024), *report and recommendation adopted*, 2025 WL 942434 (S.D. Ohio Mar. 28, 2025) ("[I]n *Brawner*, the Sixth Circuit joined the Second, Seventh and Ninth Circuits in holding that *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466 (2015), requires modification of the 'subjective' component of a deliberate indifference claim brought by a pretrial detainee.  *Brawner*, 14 F.4th at 596. *Brawner* reasoned that instead of the higher standard akin to 'criminal recklessness' adopted in *Farmer* for Eighth Amendment claims, a lower "civil recklessness" standard should apply for Fourteenth Amendment claims.").

[8] The Court also notes that in the argument section of Thompson's Opposition, Thompson asserts that "[a]ll defendants have failed to provide doctor ordered treatments for the plaintiff's cancer care and dietary supplements along with pain medications."  (Doc. No. 74 at PageID# 530.)  In Thompson's Opposition, Thompson generally argues that he received "[m]edical care that was unrealistic, ineffective and very insufficient."  (*Id.* at PageID# 531.)

16

a request that was subsequently denied by a non-defendant," as evidence that they treated Thompson.[9] (Doc. No. 70 at PageID# 487.) These allegations, Hensley asserts, demonstrate that Thompson's medical treatment was not "so cursory as to amount to no treatment at all" and that she (and Newland, Dr. Ojukwu, and Cardaras) "not only subjectively believed they were treating Plaintiff for a urinary tract infection, but also that he did not have cancer." (*Id.*) In his Opposition, Thompson responds that Hensley was "involved" because she "heard all medical complaints before they were either solved or elevated" and "disregarded all protocol and policy in her responsibility to investigate" Thompson's complaints. (Doc. No. 74 at PageID# 522.) In Defendants' Reply, Hensley asserts that she is "not authorized to diagnose medical conditions or to prescribe treatments" because she is a "Health Care Administrator, not a doctor." (Doc. No. 75 at PageID# 537.) She submits that the Complaint lacks factual allegations suggesting that she was "personally responsible for any action or wrongdoing that injured the Plaintiff." (*Id.*) According to Hensley, then, "[]because personal responsibility is a prerequisite for liability under § 1983", the Amended Complaint against her should be dismissed. (*Id.*)

For the reasons below, the Court concludes that Hensley is entitled to qualified immunity because Thompson's allegations against her are insufficient to demonstrate a plausible claim for relief, i.e., that Hensley violated Thompson's "clearly established" rights under the Eighth Amendment.

According to Thompson, "[a] referral was made for a transurethral resection of the prostate procedure before later being rejected by the ODRC[,]" and Hensley was deliberately indifferent

---

[9] Rather than repeat this argument for each Defendant below, for the sake of brevity, the Court refers to Defendants' collection of these allegations as "Thompson's Allegation of Treatment by Hensley, Newland, Dr. Ojukwu, and Cardaras" in its discussion of each of those Defendants below.

because she "knew, or should have known, that this referral should have been approved, and that the denial created risks based on Thompson's symptoms known to Hensley, but [she] refused to take any action to verify this fact and did not take any action to remedy the rejection." (Doc. No. 57 at PageID# 409.)  As a threshold matter, it is unclear what Thompson means by "verify *this* fact" because "this fact" could refer to either one of the following "facts": that the "referral should have been approved" or that "the denial created risks."  (*Id.*) (emphasis added).  According to Thompson, Hensley was "aware" of both of those "facts," and yet Thompson pleads that Hensley was deliberately indifferent because she refused to "take any action to verify" facts of which Hensley was, apparently, already aware.  The way the Court reads the Amended Complaint, Hensley knew that the ODRC should have approved the referral and although Hensley knew that the ODRC's denial of the referral would pose a risk to Thompson's health, Hensley failed to take additional steps to collect verifying health information so that Thompson could marshal that new information to "remedy the rejection."  (*Id.*) By failing to collect that additional health information from Thompson so that he could challenge the denial, Hensley "delayed Thompson's cancer treatment and caused harm."  (*Id.*)

But Thompson does not have a clearly established constitutional right to that level of assistance from Hensley.  In *Est. of Majors v. Gerlach*, 821 Fed. Appx. 533 (6th Cir. 2020), the court held that several nurse defendants were entitled to qualified immunity because they did not violate the plaintiff's clearly established Eighth Amendment rights under a similar scenario.  In that case, prisoner Majors had been diagnosed with multiple sclerosis (MS) while serving a sentence at the Minnesota Department of Corrections ("MNDOC").  *See id.* at 535.  At MNDOC, medical staff administered Interferon injections to Majors twice per week.[10]  *See id.*  Then, he was transferred to

---

[10] Interferon beta-1a injections slow the progression of MS.  *See Majors*, 821 Fed. Appx. at 535.

the Michigan Department of Corrections' Richard A. Handlon Correctional Facility ("RHCF"), where the treating physician, Dr. Gerlach, evaluated his medical records but "was skeptical of [Majors'] diagnosis" and therefore "did not prescribe Interferon to" Majors, and did not "order a diagnostic test to confirm Majors' MS diagnosis or monitor the disease's progress." *Id.* Majors suffered two MS relapses at RHCF. *See id.*

Majors was then transferred to the Gus Harrison Correctional Facility ("GHCF"), where the treating physician assistant, Kakani, "reviewed Majors' medical records, knew that he had been receiving Interferon injections for MS while in MNDOC custody, and was aware of his MS relapses. Also, like Gerlach, Kakani neither treated Majors with Interferon nor ordered a diagnostic test to confirm his diagnosis." *Id.* Additionally at GHCF—and important to this analysis—"Nurse Defendant John Solomonson allegedly ignored Majors' multiple requests for treatment and did not intervene with Kakani to secure medication for his MS." *Id.* Eventually, Majors transferred to a fourth correctional facility, West Shoreline Correctional Facility ("WSCF"), where he received treatment from another physician assistant, LaNore, and three nurses, Evertsen, Rich, and Blohm. *See Est. of Majors v. Gerlach*, 2019 WL 1242778 at *3 (E.D. Mich. Mar. 18, 2019).

On those facts, the Sixth Circuit determined that nurses Solomonson (from GHCF), and Evertsen, Rich, and Blohm (from WSCF) were all entitled to qualified immunity because they did not violate the plaintiff's clearly established rights.[11]  First, the court explained:

---

[11] Although there were originally eight (8) nurse defendants, the Sixth Circuit only granted qualified immunity to the four referenced above; of the other four, the court dismissed two based on a lapsed statute of limitations, *see Majors*, 821 Fed. Appx. at 538-39 (affirming dismissal of nurses Prevo and Smith), and two others because the plaintiff abandoned his claims against them on appeal. *Id.* at 536 n.2 (noting that the claims against nurses Vives and Richardson were abandoned). Thus, although collectively referred to as the "Nurse Defendants," the Sixth Circuit affirmed the district court's grant of qualified immunity only for nurse defendants Solomonson, Rich, Evertsen, Blohm. *See Majors v. Gerlach*, 2019 WL 1242778 at *9-10, *12-13 (district court granting qualified immunity to nurses Solomonson, Rich, Evertsen, Blohm).

19

> Plaintiffs contend that the Nurse Defendants 'shirked their constitutional responsibility when they documented Majors' rapidly deteriorating health, without any mind towards their independent duty to guarantee that his medical treatment comported with the Eighth Amendment.' Appellants' Br. at 49.  *This suggests that the Nurse Defendants should not have deferred to [physician assistant] Kakani or [physician assistant] LaNore, and instead they should have exercised their own independent medical judgment and more strenuously advocated for Majors to receive an MRI or Interferon treatment much sooner.*  No case cited by Plaintiffs puts these nurses on-notice of their duty to do so nor of what events would have triggered the performance of that duty.

*Majors*, 821 Fed. Appx. at 547 (emphasis added).  The court further reasoned:

> While Majors' nurses may have been aware of his diagnosis and treatment history, there is no evidence that they could have meaningfully influenced his course of treatment.  Even after taking the evidence in the light most favorable to Plaintiffs, the record before us indicates that *all the nurses could have done is essentially what they did do: inform their supervisors of Majors' condition and complaints*.  The record does not contain evidence of the nurses' scope of practice or how they could have raised concerns about Majors to other prison medical officials.

*Id.* (emphasis added).  The court consequently held that the nurses could not have violated Majors'

clearly established rights because "[u]ltimately, there is no clearly established law that the Nurse

Defendants' decision to defer to the judgment of their supervising medical providers who had

diagnostic and treatment authority 'consciously expos[ed] [Majors] to an excessive risk of serious

harm.'"  *Id.* (quoting *LeMarbe v. Wisneski*, 266 F.3d 429, 439 (6th Cir. 2001)).

As was the situation in *Majors*, Thompson points to no case that would have put Hensley on

notice of a duty to have "exercised [her] own independent medical judgment and more strenuously

advocated for [Thompson] to receive [a transurethral resection] much sooner."  *Majors*, 821 Fed.

Appx. at 547.  Thompson faults Hensley as the healthcare administrator because she "refused to take

action to verify" that Thompson truly deserved the transurethral resection, but Thompson's own

allegations show that a physician, Dr. Ojukwu, had "[o]n one occasion [] referred Thompson to a

specialist for a transurethral resection of the prostate" but the "referral was denied," i.e., the procedure

20

was "rejected by the ODRC." (Doc. No. 57 at PageID#s 409-11.) Hensley, just like the nurse defendants in *Majors*, was not required by the Eighth Amendment to have "exercised her independent medical judgment" to continue to "strenuously advocate" for Thompson to Dr. Ojukwu or to the ODRC, or to "raise[] concerns about [Thompson] to other prison medical officials." *Majors*, 821 Fed. Appx. at 547. Rather, Thompson's Amended Complaint shows that Hensley deferred to the judgment of other appropriate officials, even if she was "aware" that his "referral should have been approved" but did not "strenuously advocate" for him. (*Id.* at PageID# 409.)

Accordingly, the Court concludes that Thompson has not pled plausible facts showing that Hensley violated Thompson's clearly established Eighth Amendment rights. Therefore Hensley is entitled to qualified immunity.[12]

### b) Newland

Newland claims that "nowhere does the Complaint allege any facts suggesting that Plaintiff was harmed in any way due to the alleged delay in [Thompson's] cancer diagnosis." (Doc. No. 70 at PageID# 481.) According to Newland, "there is no denial of treatment here" because "the Complaint alleges that Newland treated Plaintiff's urinary tract symptoms with Bactrim and other antibacterial medications, but that these prescriptions did not alleviate his conditions[.]" (*Id.* at PageID# 487.) Also according to Newland, the Complaint does not suggest that "[she] consciously exposed Plaintiff to an excessive risk of serious harm when she herself did not believe he had cancer." (*Id.*) As with Hensley, Newland directs the Court to Thompson's Allegation of Treatment by Hensley, Newland, Dr. Ojukwu, and Cardaras to support her contention that Thompson's medical treatment was not "so

---

[12] The Court also notes that Thompson alleges that Hensley called him "anal retentive." (Doc. No. 57 at PageID# 409.) Even if true, being called derogatory names does not amount to a constitutional rights violation. *See Ondo v. City of Cleveland*, 795 F.3d 597, 607 (6th Cir. 2015) (quoting *Martin v. Sargent*, 780 F.2d 1334, 1338 (8th Cir. 1985)) ("Name calling is not a constitutional violation.").

cursory as to amount to no treatment at all" and that she "not only subjectively believed they were treating Plaintiff for a urinary tract infection, but also that he did not have cancer." (*Id.*)

In his Opposition, Thompson adds that Newland "failed to properly diagnose, which lead [sic] to the plaintiff having said cancer" and that she "did no more than basic testing even though she knew the plaintiff was a greater candidate who met the requirements for a further and thorough investigation[.]"  (Doc. No. 74 at PageID# 523.) He contends that "[h]er direct and indirect involvement was an [sic] deliberate indifference was [sic] that she knew of the plaintiff's medical history and did nothing to prevent the cancer." (*Id.* at PageID# 524.)  In the Reply, Newland argues that Thompson fails to allege facts which support a finding that her conduct satisfies the subjective component.  (Doc. No. 75 at PageID# 538.)

For the reasons below, the Court agrees with Newland.  She is entitled to qualified immunity because Thompson's Complaint does not set forth allegations against her that plausibly demonstrate that the subjective component of a deliberate-indifference claim has been met.   Thompson's allegations fail to show that Newland was "aware of facts from which the inference could be drawn that a substantial risk of serious harm [to Thompson] exist[ed]," and because his allegations fail to show that Newland "dr[ew] the inference." *Gardiner v. Corizon Health, Inc.*, 2025 WL 2233772 at *2 (6th Cir. Mar. 19, 2025) (quoting *Farmer*, 511 U.S. at 837).

Initially, it is unclear to the Court what "condition" Thompson alleges Newland "knew existed." (*Id.*)  He mentions her knowledge of a "*more* serious condition that she knew existed" and yet he also alleges that Newland "informed Thompson that she did not believe that he had cancer." (*Id.*) (emphasis added).  That discrepancy leaves the Court uncertain as to what Thompson alleges Newland knew; the "more serious condition" cannot refer to Thompson's cancer because Newland

did not believe that he had cancer.  (Doc. No. 57 at PageID# 410.)  The plain meaning of "inform" is "to communicate knowledge to."  *Inform*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/inform (last visited Oct. 21, 2025). If she "communicated [her] knowledge to" Thompson that she did not believe that Thompson had cancer, then she necessarily did not believe he had cancer.  Additionally, "more" is inherently relative, and Thompson also never describes what the *less* serious condition would have been, so the Court cannot identify what "more serious condition" Newland could have known of relative to that.

Thus, the only facts Thompson alleges Newland knew were his symptoms, the ineffectiveness of Bactrim, a drug *she* prescribed to treat those very symptoms, and that Thompson did not have cancer.  It is possible, of course, that Newland should not have waited for Thompson to respond to Bactrim before conducting additional testing, but as Defendants repeatedly note, "[a]s a general rule, a patient's disagreement with his physicians over the proper course of treatment alleges, at most, a medical-malpractice claim, which is not cognizable under § 1983."  *Darby v. May*, 2020 WL 1514602 at *2 (N.D. Ohio Mar. 30, 2020) (quoting *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017)); *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976) ("Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.").  Furthermore, the Sixth Circuit's interpretation of *Estelle* squarely forecloses a claim based on Thompson's allegations against Newland:

> In *Estelle*, a *pro se* prisoner filed a complaint against various prison officials, alleging that medical personnel were deliberately indifferent by failing to use additional diagnostic techniques in treating his back pain.  Prison officials had seen the plaintiff on seventeen occasions spanning a three month period, ultimately recommending bed rest, muscle relaxants, and pain relievers as treatment.  In response to the plaintiff's contention that the doctors should have done more by the way of diagnosis and

23

> treatment, including an X-ray, the Supreme Court held that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." As it was in *Estelle*, so it is here: *Mabry's claim against Dr. Antonini is merely a complaint that he did not order specific tests, or provide specific medications, treatment, or dosages. Such an assertion does not state a constitutional claim of deliberate indifference as to serious medical needs.*

*Mabry v. Antonini*, 289 Fed. Appx. 895, 902 (6th Cir. 2008) (citing *Estelle*, 429 U.S. at 106-07) (concluding that defendants did not "subjectively perceive[] that the failure to obtain a neurological exam presented a substantial risk to [the plaintiff] [and] then disregarded that risk[.]") (internal citations omitted) (emphasis added).  Thompson's claim is analogous to Mabry's; it is nothing more than a claim that Newland should have done more testing and/or helped him to explore different medications once she "knew . . . that the antibacterial drugs she prescribed were not working[.]" (Doc. No. 57 at PageID# 410.)

Accordingly, because Thompson has failed to allege plausible facts showing that Newland had a "sufficiently culpable state of mind," *see Rafferty v. Trumbull Cnty.*, 915 F.3d 1087, 1095 (6th Cir. 2019) (quoting *Farmer*, 511 U.S. at 834), Thompson has failed to establish that Newland violated his constitutional rights, and therefore, Newland is entitled to qualified immunity.

### c)  Dr. Ojukwu

Dr. Ojukwu claims that the Complaint "concedes that he referred the Plaintiff to a specialist for a transurethral resection of the prostate procedure, but that the referral was denied" and that the Complaint "never suggests that Plaintiff was harmed in any way due to the alleged delay in his cancer diagnosis."  (Doc. No. 70 at PageID# 481.)  According to Dr. Ojukwu, Thompson's allegations fail to meet the objective component because "although the Complaint alleges that Defendant Dr. Ojukwu

24

requested that Plaintiff be seen by a specialist for a transurethral resection of the prostate, his referral was denied by a non-defendant." (*Id.* at PageID# 486.)

As with Hensley and Newland, Dr. Ojukwu submits that Thompson's Allegation of Treatment by Hensley, Newland, Dr. Ojukwu, and Cardaras shows that Thompson's medical treatment was not "so cursory as to amount to no treatment at all" and that he "not only subjectively believed they were treating Plaintiff for a urinary tract infection, but also that he did not have cancer." (*Id.*)

In his Opposition, Thompson argues that Dr. Ojukwu "should have given the plaintiff the benefit of doubt and requested that the plaintiff be seen by a specialist,  Not after the plaintiff had approximately (6) six urinary tract infections within a six (6) month time span" and "Plaintiff's urologist and his oncologist informed the plaintiff that this tumor was festering inside for over a one year period.  Which could have been prevented from becoming cancerous had early detection been sought by the defendants once it was seen that all blood and urine tests were coming back highly elevated each time." (Doc. No. 74 at PageID# 525.)

Dr. Ojukwu responds that the Complaint *did* allege that Dr. Ojukwu referred Thompson to a specialist, but that the referral was denied.  (Doc. No. 75 at PageID# 538) (citing Doc. No. 57 at PageID# 411.)

The Court agrees that Dr. Ojukwu is entitled to qualified immunity because he did not violate Thompson's clearly established rights.  Thompson points to no clearly established right to have a physician "verify" that a "referral to specialists was necessary" when the same physician already made that referral but it was rejected by a non-party.  Thompson faults Dr. Ojukwu for failing to help him make that verification by collecting medical information that he could use to "remedy the

25

rejection" (*see id.* at PageID# 411), but just as with Hensley, Thompson does not have a clearly established constitutional right to that level of advocacy. *See Majors*, 821 Fed. Appx. at 547.

As noted above, *Majors* establishes that when a subordinate official (here, Dr. Ojukwu) disagrees with the determination of the superior official (here, the unnamed individual or entity who had the superceding authority to deny Dr. Ojukwu's referral), the prisoner has no clearly established right to have the subordinate "exercise[] their own independent medical judgment and more strenuously advocate[] for [the plaintiff] to receive [the] treatment much sooner." 821 Fed. Appx. at 547. Although Dr. Ojukwu "may have been aware of [Thompson's] diagnosis and treatment history, there is no evidence that [Dr. Ojukwu] could have meaningfully influenced [Thompson's] course of treatment." *Id.* Thompson's Amended Complaint, in fact, shows just the opposite—Dr. Ojukwu *lacked* the authority to order for Thompson the medical treatment which Dr. Ojukwu allegedly knew Thompson needed (here, the transurethral resection of the prostate), but Dr. Ojukwu tried (unsuccessfully) to obtain that treatment for him. Thus, like Hensley and the nurses in *Majors*, Dr. Ojukwu is entitled to qualified immunity because "all [Dr. Ojukwu] could have done is essentially what [he] did do[,]" i.e., make a referral based on Thompson's "condition and complaints." *Id.*

Accordingly, the Court concludes that Thompson has not pled plausible facts showing that Dr. Ojukwu violated Thompson's clearly established Eighth Amendment rights. Therefore Dr. Ojukwu is entitled to qualified immunity.

### d) Cardaras

Cardaras claims that "nowhere does the Complaint allege that she herself treated Plaintiff upon his transfer to RCI, much less that she was responsible for any of the treatment decisions made respecting his medical care." (Doc. No. 70 at PageID# 482.) As with Hensley, Newland and Dr.

Ojukwu, Cardaras references Thompson's Allegation of Treatment by Hensley, Newland, Dr. Ojukwu, and Cardaras as support for her argument that Thompson's medical treatment was not "so cursory as to amount to no treatment at all" and that she "not only subjectively believed they were treating Plaintiff for a urinary tract infection, but also that he did not have cancer."  (*Id.*)  In his Opposition, Thompson asserts that he was "under the direct medical care" of Cardaras  and that "[b]y dening [him] [the] doctor ordered dietary supplement 'Ensure' and doctor prescribed pain medicine, 'Ultram', defendant Cardaras knew of the harm she caused the Plaintiff."  (Doc No. 74 at PageID#s 520, 526.)  In the Reply, Cardaras responds that the allegations do not show that she was "personally responsible" for the treatment decisions, and thus, cannot be held liable for a § 1983 claim.  (Doc. No. 75 at PageID# 539.)

For the reasons below, the Court concludes that Cardaras is not entitled to qualified immunity.

> **(1)    Thompson had a clearly established right to adherence to his prescribed plan of treatment under applicable Sixth Circuit law.**

Construing Thompson's factual allegations against Cardaras in a light most favorable to him, between October 14, 2022 and August 2, 2022, Cardaras knew that Thompson had received treatment from surgeons, urologists, and oncologists, but she "denied him access to Ensure, Oxybutynin/Ditropan, and potentially other ordered medications, in direct contradiction to orders from" those surgeons, urologists, and onologists, she "refused to follow and carry out medical orders" and she "ignored orders from specialists."  (Doc. No. 57 at PageID# 412.)

There is a long line of Sixth Circuit cases protecting "an incarcerated individual's right to adherence to a treatment plan" under the Eighth Amendment.  *Murray v. Dep't of Corr.*, 29 F.4th 779, 791 (6th Cir. 2022) ("*Richmond v. Huq*, 885 F.3d 928 (6th Cir. 2018), clearly delineated an

27

incarcerated individual's right to adherence to a treatment plan.  This right, however, was clearly established long before this court's 2018 decision in *Richmond*.").  The court explained that "[t]he caselaw predating *Richmond* specifically established 'that interruption of a prescribed plan of treatment could constitute a constitutional violation.'" *Id.* (citing *Boretti v. Wiscomb*, 930 F.2d 1150, 1154 (6th Cir. 1991) (citing *Estelle*, 429 U.S. at 105)).  "This precise line of cases extends into *Richmond*. We therefore apply this caselaw to the present case to conclude that the right to the adherence to a prescribed plan of treatment was clearly established at the time of [the physician defendant]'s conduct." *Id.*

Thus, the Sixth Circuit has expressly resolved that the "Eighth Amendment right . . . for prison officials to diligently carry out the prescribed treatment plan" is "clearly established." *Id.* at 791. Accordingly, the Court court concludes that Thompson's allegations satisfy the "clearly established" prong of the qualified immunity inquiry.

### (2) Cardaras violated Thompson's clearly established right for prison officials to carry out his prescribed treatment plan.

Still, Thompson's allegations must overcome a second hurdle: that Cardaras violated his aforementioned "clearly established" right under the Eighth Amendment to adherence to his prescribed plan of treatment.  "To establish an Eighth Amendment claim, a plaintiff must satisfy both an objective and a subjective component." *Thomas v. Hoffman*, 2025 WL 943172 at *3 (W.D. Mich. Feb. 24, 2025) (citing *Farmer*, 511 U.S. at 834) (other citation omitted). Thompson's allegations against Cardaras satisfy both components.

### (i) Objective Component

As noted above, a plaintiff meets the objective component of a deliberate indifference when he alleges that the deprivation of medical treatment is "sufficiently serious," which means that the

28

medical condition was "diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Grote v. Kenton Cnty.*, 85 F.4th 397, 406 (6th Cir. 2023) (citing *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)); *Burrows v. Nakata*, 2025 WL 2884572 at *2 (E.D. Mich. Oct. 9, 2025) (same).

Here, his prescribed plan of treatment from "surgeons, urologists, and oncologists at The Ohio State University Hospital" included "orders for continued treatment with Ensure ordered to facilitate Thompson's weight gain and Oxybutynin/Ditropan to treat bladder spasms, and potentially other medications unknown to Thompson" but "Cadaras [sic] denied Thompson access to Ensure, Oxybutynin/Ditropan, and potentially other ordered medications, in direct contradictions to orders from surgeons, urologists, and oncologists at the Ohio State University Hospital."  (Doc. No. 57 at PageID# 412.)   She "refused to follow and carry out medical orders."   (*Id.* at PageID# 413.) Thompson's condition was "diagnosed by a physician as mandating treatment" because surgeons, urologists, and oncologists issued orders for him to receive Ensure to facilitate his weight gain and Oxybutynin/Ditropan to treat his bladder spasms, and potentially other medications to treat those conditions.  And, critically, Cardaras's denial "caused [him] unnecessary pain and suffering" and "harm."  (*Id.*)   Taken together, those allegations satisfy the objective component of an Eighth Amendment claim.  *See Yaklich*, 148 F.3d at 601 (explaining that "the plaintiff must allege that he has suffered or is threatened with suffering actual harm as a result of the defendants' acts or omissions[.]").

True, Thompson does not use the word "diagnose" in the section of his Amended Complaint regarding Cardaras,[13] but that omission does not defeat Thompson's claim against her for two (2)

---

[13] In the general fact section of his Amended Complaint, Thompson does claim that he was "diagnosed with bladder and prostate cancer" and that he "has a previously diagnosed significant health and medical issue."  (Doc. No. 57 at PageID#

29

reasons.  First, "the Federal Rules of Civil Procedure simply do not require any magic words or recitations to be made in a complaint[.]"  *Hank v. Great Lakes Constr. Co.*, 790 Fed. Appx. 690, 701 (6th Cir. 2019) (quoting *Knapp v. City of Columbus*, 93 Fed. Appx. 718, 720 (6th  Cir. 2004)); *see, e.g.*, *Ochoa v. City of Chicago*, 2024 WL 1050239 at *19 (N.D. Ill. Mar. 11, 2024) ("The complaint does not mention the words '*Terry* stop,' or anything along those lines.  The lack of phraseology is unimportant, because a complaint does not have to contain magic words.").  Second, a "diagnosis" is "the determination of a medical condition (such as a disease) by physical examination or by study of its symptoms."  *Diagnosis*, Black's Law Dictionary (12th ed. 2024).  The surgeons, urologists, and oncologists determined that Thompson suffered from weight loss and bladder spasms and ordered that he receive the above medications to treat those medical conditions, so they did diagnose him and then prescribe mediciations to him.

Therefore, Thompson's medical condition was "diagnosed by a physician as mandating treatment," which means his medical condition was "sufficiently serious."  *Grote*, 85 F.4th at 406 (citing *Harrison*, 539 F.3d at 518); *Wilson*, 501 U.S. at 298.  Accordingly, the allegations against Cardaras satisfy the objective component.

### (ii)    Subjective Component

As noted above, "'[t]o satisfy the subjective component, the plaintiff must allege facts which, if true, would show (1) that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, (2) that [the official] did in fact draw the inference, and (3) that [the

---

407.)  He does not, however, allege any connection between the "significant health and medical issue" in his general fact section and the weight loss and bladder spasms for which he received treatment from the surgeons, urologists, and oncologists at The Ohio State University Hospital, so the Court cannot deduce from this general allegation alone that he received a "diagnosis" for those conditions specifically.

official] then disregarded that risk.'"  *Galeski v. Washington*, 2025 U.S. App. LEXIS 7793 at *4-5 (6th Cir. Apr. 2, 2025) (quoting *Comstock*, 273 F.3d at 703) (numerals added).

Here, the allegations satisfy all three sub-components.  (1) First, Cardaras was aware that Thompson "received treatment from surgeons, urologists, and oncologists at The Ohio State University Hospital" and aware of his reports of "continuous pain in his groin and lower stomach area" and she allegedly knew "that treatments and medications ordered by specialists were necessary," so she perceived the requisite facts about his medical condition; and an inference could be drawn that his medical condition posed a "substantial risk" because that same medical condition constituted precisely the "sufficiently serious" medical condition diagnosed (by the above professional physicians) as warranting treatment with Ensure, Oxybutynin/Ditropan, and potentially other medications.  (Doc. No. 57 at PageID#s 412-13.)  (2) Second, she necessarily drew the inference between his medical condition and the risk it posed to him because she "knew . . . that treatments and medications ordered by specialists were *necessary*" and yet she "ignored orders from specialists regardless of the associated *risks that she knew existed* as a result of ignoring these orders."  (*Id.*) (emphasis added).  (3) Third, she disregarded that risk by "den[ying] Thompson access" to his prescribed medication "in direct contradiction to orders from surgeons, urologists, and oncologists" and by "refus[ing] to follow and carry out medical orders."  (*Id.*)

Accordingly, the Court concludes that assuming Thompson's allegations are true,[14] Cardaras violated Thompson's clearly established Eighth Amendment right to his prescribed plan of treatment and is therefore not entitled to qualified immunity.

---

[14] The Court also pauses to underscore that "[w]hether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence[,]" *Winkler v. Madison Cnty.*, 893 F.3d 877, 891 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. 842); *Stewart v. Taft*, 235 F. Supp. 2d 763, 768 (N.D. Ohio 2002) (same), but the Court "may not resolve questions of fact on a motion to dismiss."

### e) **Wheeler and Cornwell**

Wheeler claims that "nowhere does the Complaint contend that Plaintiff lost weight, that his pain was not controlled with Tylenol, or that he suffered any injury as the result of the lack [of] treatment he allegedly received for his left testicle lump[,]" and Cornwell claims that Thompson's allegations against her are "essentially one and the same" as the allegations against Wheeler, that "other than generally alleging that Defendant Cornwell is or should have been aware that Plaintiff has cancer, [and that] nowhere does the Complaint allege that Plaintiff suffered any injury because of any action or wrongdoing for which Defendant Cornwell was personally responsible." (Doc. No. 70 at PageID#s 482-83.)  In essence, they both argue that "nowhere does the Complaint allege that Plaintiff suffered any harm because of the allegedly inadequate treatment they provided" and that Thompson's allegations "amount to nothing more than a disagreement with the testing and treatment he received[.]" (*Id.* at PageID# 488) (citing *Rhinehart*, 894 F.3d at 737-38.  Even though Thompson alleges that Wheeler and Cornwell denied him Ensure, "there is no suggestion in the Complaint that without Ensure Plaintiff lost any weight, much less that he lost so much weight that his condition became [conscience] shocking." (*Id.*)  They further contend that denying him access to painkiller Ultram/Tramadol did not violate his Eighth Amendment rights because "there is no suggestion anywhere in the Complaint that Plaintiff was ever in moderate to severe pain or that the Tylenol he was given did not work or could not be tolerated by him." (*Id.*)  Wheeler specifically points out that the Complaint does not allege that the lump on his testicle "was ever diagnosed by a physician as mandating treatment or that it was so obvious that even a lay person would easily recognize the

---

*Beaver Rsch. Co. v. Huntington Nat'l Bank*, 2024 WL 5365041 at *5 (E.D. Mich. Nov. 19, 2024) (citing *In re Cardizem CD Antitrust Litig.*, 332 F.3d 896, 900 (6th Cir. 2003)).

necessity for a doctor's attention[,]" that is, that Wheeler knew that the lump was "serious."  (*Id.* at PageID# 489.)

In his Opposition, Thompson asserts that Wheeler "chose to defy doctor orders" and told Thompson that "she did not have to follow the doctor orders and that she was not going to give the plaintiff the ordered pain medicine nor the dietary supplements."  (Doc. No. 74 at PageID# 527.)  He repeats substantively the same assertions against Cornwell.  (*Id.* at PageID#s 528-29.)  He contends that he "repeatedly complained [to them] of painful urination, bloody urine, painful stomach pain, [and] inability to have bowel movements."[15]  (*Id.* at PageID# 530.)  In their Reply, they restate their argument that the causal connection between their conduct and Thompson's injuries is "at best speculative, especially since there is no indication in any of his filings that Plaintiff did not get along just fine without his preferred treatment."  (Doc. No. 75 at PageID# 539.)

The Court agrees with Wheeler and Cornwell.  For the reasons set forth below, the Court concludes that Wheeler and Cornwell did not violate Thompson's Eighth Amendment rights because Thompson's allegations against them fail to include that Wheeler's and Cornwell's denial of his prescribed plan of treatment caused him to suffer harm, and therefore, he failed to satisfy the objective component of his Eighth Amendment claim.

---

[15] The Court notes that it cannot consider new allegations Thompson raises in his Opposition; it is axiomatic that "an opposition brief is not the proper procedural vehicle for amending a pleading."  *Bryant v. Collins*, 2025 WL 2840755 at *6 (N.D. Ohio Oct. 7, 2025) (Barker, J.); *see also Am. Ass'n of Nurse Anesthesiology v. Kennedy*, 2025 WL 2459208 at *5 (N.D. Ohio Aug. 26, 2025) (Barker, J.) (quoting *Mohamed v. Bank of Am., N.A.*, 771 F. Supp. 3d 695, 708 n.5 (D. Md. 2025)) ("[A] memorandum in opposition to a motion is not a proper vehicle for amending a complaint or adding new claims."); *Tice v. Bos. Sci. Corp.*, 2023 WL 360983 at *2 (N.D. Ohio Jan. 23, 2023) (Lioi, J.) (quoting *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 440 (6th Cir. 2020)) (underscoring that "[t]o the extent Tice is attempting to amend her complaint through her opposition brief, it is well established that a plaintiff cannot use that vehicle to amend the pleadings because '[a]s a general rule, a court considering a motion to dismiss 'must focus only on the allegations in the pleadings.' . . . This does not include plaintiffs' responses to a motion to dismiss.'"); *Rushing v. Wood Health Co., LLC*, 2025 WL 959472 at *6 (N.D. Ohio Mar. 31, 2025) (citing *Petty v. Bluegrass Cellular, Inc.*, 2021 WL 4448937 at *2 (W.D. Ky. Sept. 28, 2021) to note that the court in *Petty* "reject[ed] a *pro se* plaintiff's attempt to supplement her amended complaint through her brief in opposition to the defendant's motion to dismiss").

As noted above, an allegation that the defendant's conduct caused the plaintiff to suffer harm is essential to state a claim under the Eighth Amendment. *See Heid*, 2020 WL 5201082 at \*6 (quoting *Yaklich*, 148 F.3d at 601) ("The Sixth Circuit recognizes that '[i]mplicit in [the deliberate indifference] standard is the recognition that the ***plaintiff must allege that he has suffered or is threatened with suffering actual harm as a result of the defendants' acts or omissions*** before he can make any claim with an arguable basis in Eighth Amendment jurisprudence.") (emphasis added); *Grant v. Farnsworth*, 2025 WL 43426 at \*2 (N.D. Ohio Jan. 7, 2025) (citing *Thompson v. Mich. Dep't. of Corr.*, 25 Fed. Appx. 357, 359 (6th Cir. 2002)) (hereinafter, "*MDOC*") ("To state a claim for deliberate indifference under the Eighth Amendment in the Sixth Circuit, Plaintiff must allege facts suggesting that he has been threatened or harmed as a result of Defendant's conduct."). The reason for this requirement is the general principle that every § 1983 constitutional tort claim requires the plaintiff to trace the defendant's unconstitutional conduct to the plaintiff's injury. *See Ramsey v. Rivard*, 694 F. Supp. 3d 955, 991 (E.D. Mich. 2023), *aff'd in part, appeal dismissed in part*, 110 F.4th 860 (6th Cir. 2024) (citing *Deaton v. Montgomery Cnty.*, 989 F.2d 889 (6th Cir. 1993)) ("It is axiomatic that an essential element of every civil rights claim is the establishment of causation between the allegedly wrongful conduct and the plaintiff's injury.").

In *Yaklich*, the prisoner-plaintiff filed an Eighth Amendment deliberate indifference claim against defendant employees of the Ohio Department of Corrections for failing "to protect him from the possible physical harm that he would have been subjected to had he not done what 'they' said." 148 F.3d at 600. The court observed that "the gist of Wilson's contention is that on two occasions, he received threats from the 'Aryan Brotherhood' prison gang and that prison officials failed to take action to protect him. There is no allegation that he actually suffered any harm because of the

34

defendants' conduct or that he is currently threatened with such harm." *Id.*  The court held that "implicit" in the standard that "prison officials must exhibit deliberate indifference to the health or safety of the inmate" is "the recognition that the  plaintiff must allege that he has suffered or is threatened with suffering actual harm as a result of the defendants' acts or omissions before he can make any claim with an arguable basis in Eighth Amendment jurisprudence.  Wilson has completely failed to do so in this case." *Id.* at 601.  He "advanced no allegation that the Aryan Brotherhood actually injured him physically. Nor does he even hint that he has suffered any emotional or psychological injury from the alleged threat." *Id.*  Therefore, the Sixth Circuit affirmed the district court's dismissal of his claim.  And in *MDOC*, the Sixth Circuit affirmed the district court's dismissal of the plaintiff's Eighth Amendment claim where he alleged "that he was endangered by being labeled a snitch" because it "was unsupported by any allegation of resultant harm."  25 Fed. Appx. at 359.

Relying on *Yaklich*, the court reached the same result in *Heid*.  2020 WL 5201082 at *6. In *Heid*, the prisoner "engaged in a fist fight that arose from his use of a phone claimed by inmates in the 'black supremacist gang'" but the prisoner "was a willing participant in the altercation" because he followed his attacker to "further engage in a fight with him." *Id.* at *2, *6.  The court concluded that the defendants could not "be held liable for the injuries that [the prisoner] sustained during the altercation because [the prisoner]'s injuries were the product of his own decision to engage in the fight as opposed to an act or omission by Defendants." *Id.* at *6 (citation omitted).  The outcome was the same in *Grant*, where the "Plaintiff's complaint fail[ed] to include allegations that he has been harmed or has been threatened with harm as a result of the corrections officer's alleged comments." *Grant*, 2025 WL 43426 at *2.

35

*Imburgia v. Cruz*, 2012 WL 1035731 (N.D. Ohio Mar. 27, 2012) further illustrates this requirement. There, the court held that the prisoner-plaintiff failed to state a claim against the defendant where the defendant "informed other inmates that Plaintiff was in prison for raping a child" which allegedly "put him at risk of physical danger and 'possibly fatal harm' from other inmates." *Imburgia,* 2012 WL 1035731 at *7. Citing *Yaklich*, the court highlighted that

> Plaintiff fails to allege that he suffered any actual harm as a result of Defendant Cruz's alleged statement to other inmates that Plaintiff had raped a child. Plaintiff seeks monetary damages in the form of compensatory and, apparently, punitive damages. However, requests for damages seek to compensate plaintiffs for past injuries. In this case, Plaintiff states no allegation that any inmate actually injured him physically nor does he allege that he suffered any emotional or psychological injury from the fear of physical injury.

*Imburgia*, 2012 WL 1035731 at *8 (citing *Yaklich*, 148 F.3d at 601). The court recently applied *Yaklich* in *Williams v. Massey*, 2025 WL 2025 WL 2254526 (E.D. Mich. Aug. 7, 2025) to dismiss the prisoner's claim after determining that the "the plaintiff has not set forth a serious medical need regarding his meals-in accommodation; for example, the complaint does not allege any harms that have occurred or may occur due to his meals-in accommodation being denied, such as Plaintiff no longer having access to meals." *Id.* at *4 (citing *Yaklich*, 148 F.3d at 601) (other citations omitted).

Other cases also illustrate the importance of pleading that the defendant's conduct caused the plaintiff to suffer harm to state an Eighth Amendment claim. In *McDowell v. Mattingly*, 2021 WL 2211686 (W.D. Ky. June 1, 2021), the court held that the prisoner-plaintiff failed to satisfy the objective element where the nurse defendants "mistakenly administered two drugs not prescribed to him" three times in part because there was "no evidence indicating that Plaintiff required additional medical treatment, or that the lack of treatment posed any risk of harm to him." *Id.* at *1, *8. In turn,

36

the court relied on *Cotton v. Bureau of Prison*s, 2020 WL 907583 (N.D. Fla. Jan. 22, 2020), where

the court had likewise determined the prisoner-plaintiff failed to make the same showing because

> there are no facts showing that Cotten needed further medical treatment or that lack of treatment posed a substantial risk of harm to Cotten. Indeed, as stated above, there are no allegations in any version of Cotton's complaints that she suffered any additional or other harm because she did not get additional treatment . . . Moreover, there is no allegation that the side effects she initially experienced were more than temporary or that they did not subside or resolve on their own without medical intervention. Cotten, does not allege, in any of her complaints, for example, that she has suffered any symptoms that were made worse without treatment or that required later treatment.

*Id.* at *8-9.  In summary, the plaintiffs in the above cases failed to allege a connection between the

defendants' conduct and their injury, so the Court dismissed their claims.

This Court takes the same approach.  Here, Thompson's allegations against Wheeler and

Cornwell are plainly deficient.  Indeed, for each of the four (4) *other* Defendants, Thompson properly

alleges that their "actions and lack of prompt action" caused him "unnecessary pain and suffering"

and/or "delayed [his] cancer treatment and caused harm."  (*See* Doc. No. 57 at PageID# 409

[Hensley]; *Id.* at PageID# 410 [Newland]; *Id.* at PageID#s 411-12 [Dr. Ojukwu]; *Id.* at PageID# 413

[Cardaras].)  Yet Wheeler and Cornwell accurately highlight that those critical allegations are entirely

missing from his allegations against them.  (*Id.* at PageID#s 413-15.)  To be sure, in his Opposition,

Thompson adds allegations that suggest their actions/omissions caused him harm:

> As with all of the defendants, defendant Wheeler did know and was aware of the plaintiff's health problems and the higher risk possibilities of the life threatening situations that the plaintiff could be in.  *Especially by her not following the instructions ordered by the specialists, (urologist and Oncologist) for pain medications and dietary supplements.*
>
>                         \*\*\*
>
> Defendant Cornwell knows or should know that if the plaintiff does not receive said doctor ordered prescribed medication that *she could and has caused harm to the plaintiff.*

37

(Doc. No. 74 at PageID#s 527-28) (emphasis added). But as noted above, this Court cannot consider those new allegations because Thompson raised them in his Opposition rather than in his Amended Complaint. *See, e.g.*, *Bryant*, 2025 WL 2840755 at *6; *Am. Ass'n of Nurse Anesthesiology*, 2025 WL 2459208 at *5; *Mohamed*, 771 F. Supp. 3d at 708 n.5; *Tice*, 2023 WL 360983 at *2; *Waskul*, 979 F.3d at 440. Thompson has been aware of Wheeler's and Cornwell's argument that the Amended Complaint is devoid of any allegation that giving Thompson incorrect medications caused him to suffer harm, but he did not move under Fed. R. Civ. P. 15 to amend his Amended Complaint despite having ample opportunity to do so.

Accordingly, the Court concludes that because the Amended Complaint lacks any allegation that Wheeler or Cornwell caused Thompson to suffer harm, the allegations against them do not satisfy the objective component.

In summary, Defendants Hensley, Newland, Dr. Ojukwu, Wheeler, and Cornwell are entitled to qualified immunity because they did not violate Thompson's clearly established constitutional rights, but Defendant Cardaras is not entitled to qualified immunity.

**B.** **_Respondeat Superior_ and Supervisory Liability under § 1983 for Cardaras**

According to Cardaras,[16] the Complaint does not allege that she "provided Plaintiff with direct patient care" or the "active personal involvement" of Cardaras in Thompson's treatment, but rather that she "failed to verify facts" which caused his suffering. (Doc. No. 70 at PageID# 490.) That omission, she argues, is fatal to Thompson's § 1983 claims because § 1983 claims cannot be based

---

[16] The Court has already determined that the Court can dismiss Hensley, Newland, Dr. Ojukwu, Wheeler, and Cornwell because they are entitled to qualified immunity. *See infra* Section III.A.2. Accordingly, the Court only evaluates the applicability of Defendants' arguments as to Cardaras.

on a mere *respondeat superior* theory of liability. Thompson does not specifically respond to the *respondeat superior* argument in his Opposition.  (*See generally* Doc. No. 74.)

*Respondeat superior* is a common-law theory of liability that allows a plaintiff to atrribute liability to a principal for an agent's tortious conduct when the agent acts within the scope of his agency.  *Hamilton v. Carell*, 243 F.3d 992, 1001 (6th Cir. 2001) ("Under the doctrine of *respondeat superior*, an employer is liable, despite having no fault whatsoever, for the acts of its employees taken within the scope of their employment."); *Husayn v. Mitchell*, 142 F.4th 667, 678 (9th Cir. 2025) ("In agency   law,   the   doctrine   of *respondeat superior* holds the principal legally   accountable   for its agents' acts.").  Because it is based on the principles of agency, *respondeat superior* liability depends on the mere existence of control by the principal over the agent.  *See Harford Accident & Indem. Co. v. J.I. Case Co.*, 625 F. Supp. 1251, 1254 (S.D. Ohio 1985) ("[T]he doctrine of *respondeat superior* is based in the presumed power of an employer to control the actions of her employees."). Cardaras, to be sure, accurately notes that plaintiffs cannot base § 1983 claims on a *respondeat superior* theory of liability.  *See Waters v. Drake*, 105 F. Supp. 3d 780, 795 (S.D. Ohio 2015) (citing *Heyerman v. Cnty. of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012)) ("A theory of *respondeat superior* does not provide a basis for § 1983 liability.").

But while § 1983 precludes *respondeat superior* liability, § 1983 permits "supervisory liability."  *Venema v. West*, 133 F.4th 625, 632-33 (6th Cir. 2025).  The Sixth Circuit has explained that "supervisory liability [under § 1983] comprises two concepts . . . active involvement by the supervisor and causation."  *Crawford*, 15 F.4th at 761.  At the motion to dismiss stage, "[t]o state a claim of supervisory liability under § 1983, plaintiffs must plausibly allege that a defendant 'authorized, approved, or knowingly acquiesced in the unconstitutional conduct . . . of his

39

subordinates through the execution of his job functions.'"  *Does v. Whitmer*, 69 F.4th 300, 306 (6th Cir. 2023) (quoting *Crawford*, 15 F.4th at 761 and *Peatross v. City of Memphis*, 818 F.3d 233, 242 (6th Cir. 2016)); *see also Venema*, 133 F.4th at 633.  "[A] 'prerequisite of supervisory liability under § 1983 is unconstitutional conduct by a subordinate of the supervisor.'"  *Humphrey v. Friar*, 2023 WL 6390794 at *2 (6th Cir. Oct. 2, 2023) (quoting *McQueen v. Breecher Cmty. Schs.*, 433 F.3d 460, 470 (6th Cir. 2006)).

First, Cardaras is wrong that Thompson's Amended Complaint fails to allege that she was "personally involved in the alleged deprivation of federal rights."  (Doc. No. 70 at PageID# 490) (quoting *Nwaebo v. Hawk-Sawyer*, 83 Fed. Appx. 85, 87 (6th Cir. 2003)).  In *Nwaebo*, the prisoner-plaintiff brought deliberate indifference claims against the Director of the Federal Bureau of Prisons, three wardens, three associate wardens, and a health services administrator.  *See* 83 Fed. Appx. at 85. While Cardaras cites the Sixth Circuit's remark that officials must be "personally involved in the alleged deprivation of federal rights" to be held liable under § 1983, in the very next sentence, the Sixth Circuit applied that principle, explaining that "Nwaebo failed to allege with any degree of specificity which of the named defendants were personally involved in or responsible for each of the alleged violations of his constitutional rights."  *Id.* at 87.  All but two of the defendants in *Nwaebo* were not referenced in the body of Nwaebo's complaint,[17] and a review of Nwaebo's complaint confirms that he failed to assign any specific conduct to any of the other defendants.  *See id.*; *Nwaebo v. Hawk-Sawyer, et al.*, 4:03-cv-111, Doc. No. 1 (N.D. Ohio Jan. 17, 2003).

Thompson's Amended Complaint contains just what Nwaebo's lacked.  Thompson clearly alleges that Cardaras was "personally involved in or responsible for each of the alleged violations[,]"

---

[17] And the two that were named were not held liable because Nwaebo's basis for his claim was merely that they denied his administrative grievance.  *See id.*

40

*Nwaebo*, 83 Fed. Appx. at 87, because unlike Nwaebo, Thompson separates his allegations into sub-sections organized defendant-by-defendant, and for all of them, he precisely alleges what they were aware of and how they "acted with deliberate indifference" in one or two short paragraphs outlining the specific action/omission that gave rise to the alleged Eighth Amendment violation. (*See* Doc. No. 57 at PageID#s 408-15.) For Cardaras specifically, he directly attributes his constitutional rights violation to her based on what *she* did (denying him certain medication) based on what *she* knew (e.g., that doctors ordered Thompson to take the medication and the necessity of that medication). (*Id.* at PageID#s 412-13.) Those defendant-specific allegations clear the threshold for "personal involvement" in the alleged violation. *See id.*

But second, and more importantly, Cardaras evidently misses that she has attempted to rebut a theory of liability Thompson simply did not invoke. At no point in his Amended Complaint does Thompson allege that Cardaras is liable in her capacity as the supervisor of a subordinate official who violated Thompson's rights. He neither identifies such a subordinate, nor suggests that Cardaras "authorized, approved, or knowingly acquiesced in the unconstitutional conduct" of an unnamed subordinate or any other Defendant. *Whitmer*, 69 F.4th at 306.

Accordingly, while Cardaras accurately asserts § 1983 liability requires "personal involvement" by a supervisor, she is mistaken to view it as lacking in this case—she was directly involved in the alleged violation. But because Thompson never even asserts that Cardaras was liable under a *respondeat superior* or supervisory liability theory—i.e., the Amended Complaint does not suggest that Cardaras is liable for the conduct of a subordinate—it is irrelevant that Thompson successfully alleges Cardaras's "personal involvement" because she has simply failed to defeat a theory of liability Thompson's Amended Complaint does not rely on.

41

**IV.     Conclusion**

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. No. 70) is **GRANTED IN PART AND DENIED IN PART** as follows: Defendants Hensley, Newland, Dr. Ojukwu, Wheeler, and Cornwell are hereby **DISMISSED** as Defendants in this case, but the Court declines to dismiss Thompson's claim against Defendant Cardaras.

**IT IS SO ORDERED.**

 *s/Pamela A. Barker*
PAMELA A. BARKER
Date:  October 30, 2025               U. S. DISTRICT JUDGE