**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LONNIE THOMPSON,** | : | |
| | : | **Case No. 1:23-CV-01656** |
| **Plaintiff,** | : | |
| | : | **Judge Pamela A. Barker** |
| **v.** | : | |
| | : | **Magistrate Judge James E. Grimes Jr.** |
| **JULIE A. HENSLEY, *et al*.,** | : | |
| | : | |
| **Defendants.** | : | |

---

**REPLY OF DEFENDANT CARDARAS TO PLAINTIFF'S OPPOSITION (ECF 96)**

---

## I.    Introduction

Plaintiff, Lonnie Thompson's ("Plaintiff") Reply ("Response") to the Motion for Summary Judgment ("Motion") filed by Defendant, Kelli Cardaras ("Defendant"), a Certified Nurse Practitioner ("CNP") at the Ross Correctional Institution ("Ross"), essentially contends not only that he exhausted his claims against her regarding his cancer treatment at Ross, but also that "between the dates of October 14, 2022 until August 2, 2022," she was deliberately indifferent to his medical care because she refused to provide him with Ensure and Ditropan in accordance with his doctors' orders. ECF No. 3-1, PageID 56; ECF No. 96, PageID 807, 811. However, rather than supporting either of these claims, the evidence utterly refutes them. So, then, what does Plaintiff claim Defendant did to cause him harm?

In his Complaint, Plaintiff alleges that both an OSU urologist and an OSU oncologist ordered "my medicine of 'Ensure,' a liquid protein for my weight gain and to sustain it due to me having to take immunotherapy for the rest of my life knowing that my immune system was compromised from the cancer treatment that I was and still am having done." ECF No. 3-1, PageID

56. Supposedly, "[t]his prescribed medicine was ordered to enhance and strengthen his immune system." *Id.*

In addition, Plaintiff claims that an OSU urologist "ordered the medication of 'Ditropan,' which is a medicine to treat the constant and continued bladder spasms that I have had and am still having due to the st[e]nt that is inside of my bladder and down into my urethra." *Id.* The Complaint then goes on to complain that "[Defendant] constantly denied my request for these medications," thereby "caus[ing] plaintiff unnecessary pain and suffering with her wanton and blatant disregard to my health and wellbeing." ECF No. 3-1, PageID 56. However, fatal to both claims is the fact that there is not even a scintilla of evidence suggesting Defendant refused to follow any doctors' orders.

## II.    Exhaustion

Putting aside that it would have been virtually impossible for anyone to have been deliberately indifferent to Plaintiff's medical care "between the dates of October 14, 2022, until August 2, 2022" as Plaintiff claims, ECF No. 3-1, PageID 56, the first problem with his Complaint is the insistence that he exhausted his deliberate indifference claims against Defendant concerning Ensure and Ditropan at any point in time, much less during the dates specified in the Complaint. ECF No. 96, PageID 807.

Of course it has long been settled that the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires inmates such as Plaintiff to exhaust their administrative remedies before they can challenge their conditions of confinement in federal court. *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) ("An inmate 'shall' bring 'no action'..., absent exhaustion of available administrative remedies."); *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999) ("A court may not excuse a failure to exhaust ") (quoting *Ross*, 136 S. Ct. at 1856).  But while Plaintiff submits

the Declaration of Assistant Chief Inspector Roberta Murphy ("Murphy Declaration") to counter Defendant's claim that he failed to exhaust his administrative remedies against her concerning the refusal of Ensure and Ditropan, ECF No. 96, PageID 807, the Declaration does no such thing.

Indeed, contrary to Plaintiff's Affidavit, ECF No. 96-3, PageID 823, according to the Murphy Declaration, between October 14, 2022, and August 12, 2023, which is the relevant time period, Plaintiff submitted only one Informal Complaint Resolution that advanced to a Notice of Grievance and then to appeal concerning the medical care he received from Defendant. ECF No. 94-1, PageID 763. Notably, that grievance was directed at Plaintiff's mental health medications being interrupted so he could receive pain medication and a delay in his Ditropan due to an access and distribution issue within the institution pill room rather than any action taken by Defendant to refuse Plaintiff Ditropan, follow his doctor's orders, or adhere to his treatment plan. ECF No. 94-1, PageID 763. Nor does Plaintiff's grievance make any mention of Ensure or nutritional supplementation. *Id*. Therefore the Murphy Declaration concludes that Plaintiff failed to exhaust his available administrative remedies concerning his access to Ensure and the provision of Ditropan by Defendant between October 14, 2022, and August 12, 2023. ECF No. 94-1, PageID 763.

In other words, although the grievance Plaintiff's Affidavit cites, ECF No. 96-3, PageID 823-824, alleges he "can't receive any type of pain medication from her," ECF No. 96-5, PageID 827, it never refers to Ensure or Ditropan, neither of which is a pain medication, nor does it suggest that Defendant, herself, refused to give him either of these medications in contravention of any doctor's orders or treatment plan. *Id.* Rather, the grievance at issue merely acknowledges that Defendant was restricted from giving Plaintiff Ultram for more than three days in a row and that

she had him taken off his mental health medication, Remeron, so he could start taking Elavil, a dual-use medication she prescribed to treat both his pain and his mental health problems. *Id.*

While the disposition of the grievance goes on to explain there was some delay in obtaining Plaintiff's Ditropan due to an access and distribution issue caused by the prison's pill room staff, which was since corrected, this aside was based on a review of the entirety of Plaintiff's medical record rather than any allegation he raised suggesting Defendant refused to give him Ensure, Ditropan, follow his doctor's orders, or adhere to his treatment plan. ECF No. 94-1, PageID 763. This is not surprising since there is not even a scintilla of evidence suggesting Defendant refused to do any of these things. Since Plaintiff never exhausted his administrative remedies regarding Defendant's purported refusal to carry out doctor's orders, adhere to his treatment plan, provide him with Ensure, or provide him with Ditropan, ECF No. 94-1, PageID 763, she is entitled to summary judgment in this matter due to his failure to exhaust. *Freeman v. Francis*, 196 F.3d 641, 645 (6th Cir. 1999).

## III. Deliberate Indifference

The second problem with Plaintiff's Complaint is the lack of any evidence supporting his deliberate indifference claims against Defendant. Certainly, the Eighth Amendment protects an individual from "cruel and unusual punishments." U.S. Const., amend. VIII. Likewise, it has long been settled that a government official violates an incarcerated person's Eighth Amendment rights when he or she shows "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). *See also Murray v. Ohio,* 29 F.4th 779, 786-87 (6th Cir. 2022).

Therefore, to survive summary judgment, Plaintiff must show both a "sufficiently serious" deprivation of medical treatment, *Wilson v. Seiter,* 501 U.S. 294, 298 (1991), and that the Defendant had a "sufficiently culpable state of mind" in denying him medical care. *Wilson,* 501

U.S. at 297. Ultimately, then, Plaintiff must show that Defendant knew of yet disregarded an excessive risk to his health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

In his Complaint, Plaintiff essentially claims he was directly under Defendant's medical care and that by refusing him the doctor-ordered dietary supplement 'Ensure' for weight gain and the enhancement and strengthening of his immune system, and the doctor-prescribed medicine 'Ditropan' to treat his bladder spasms, Defendant knew of the harm she was causing him. ECF No. 3-1, PageID 56-57. Plaintiff's Response further expands upon these allegations by contending that his cancer is "multiplying the risks to [his] health and very existence," that "every lay person is aware that cancer is a potentially deadly disease, ECF No. 96, PageID 809, and that any deviation from the doctor-ordered medication or treatment of his cancer would violate the Eighth Amendment's strictures against deliberate indifference. ECF No. 96, PageID 811. It is therefore significant that there is no evidence suggesting Defendant deviated from any treatment plan or doctor's orders pertaining to Plaintiff anywhere in the record.

### A.    Ensure

Indeed, by contrast with Plaintiff's assertions concerning his need for supplemental nutrition, there is no evidence suggesting that any doctor, whether from OSU or from anywhere else, ever ordered that he be given Ensure "for weight gain" or to "enhance and strengthen his immune system," ECF No. 3-1, PageID 56, much less that Defendant ever refused to follow or carry out any such doctor's orders or treatment plan. ECF No. 96, PageID 812. For instance, when Plaintiff inquired as to whether he would need Ensure while undergoing chemotherapy treatment he was informed by the prison's diet technician that it would depend on how well he was tolerating the treatments and if he was having any weight loss. Defendant's Ex. C, p. DRC003496, attached.

Just as important, the only treatment plan ever issued that even mentioned Ensure was the one recommended on July 28, 2023, by Dr. Elkhatib, Plaintiff's OSU oncologist, which suggested that he be given Ensure for weight loss. ECF 96-4, PageID 825. However, nowhere did Dr. Elkhatib or anyone else order Plaintiff to be provided with Ensure for weight gain or to enhance his immune system. *Id.* And since it is undisputed that Plaintiff gained weight while under Defendant's care, ECF No. 96, PageID 812, even pursuant to Dr. Elkhatib's order she would have had no reason to provide Plaintiff with Ensure. Accordingly, Plaintiff cannot show Defendant objectively acted with deliberate indifference to a sufficiently serious deprivation of nutritional supplements, especially since there is no evidence that he suffered any harm for want of Ensure. *See Wilson,* 501 U.S. at  303; *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997).

But there is yet another reason why Defendant could not have refused to follow and carry out doctor's orders respecting Ensure as Plaintiff claims. ECF No. 96, PageID 812. Critically, Dr. Elkhatib's July 28, 2023, recommendation regarding Ensure was not issued until seven days after the very last time Defendant saw Plaintiff on July 21, 2023, and immediately prior to his August 2, 2023, transfer to the Madison Correctional Institution. Defendant's Ex. C, p. DRC003096-97. Therefore, Defendant had neither the time, the occasion, nor the opportunity to be made aware of Dr. Elkhatib's July 28, 2023, order concerning Ensure. *Id.* Since this is the only doctor's order respecting any nutritional supplement for Plaintiff, but also post-dates Defendant's treatment of him, Defendant could not have had a "sufficiently culpable state of mind" in failing to provide Plaintiff with Ensure. *Wilson,* 501 U.S. at 297

Furthermore, even if there was some risk Plaintiff might lose weight if he was not given Ensure, there is no evidence suggesting Defendant perceived this to be a possibility, especially

6

since Plaintiff gained weight under her care. For instance, on January 4, 2023, Plaintiff weighed 162 pounds while by April 11, 2023, his weight was up to 181 pounds. *See* Ex. B, Medical Records attached to the Declaration of Kelli Cardaras, ECF No. 94-2. Since "an official's failure to alleviate a significant risk that he should have perceived but did not" does not amount to deliberate indifference, *Farmer*, 511 U.S. at 838, Defendant should be awarded summary judgment on Plaintiff's deliberate indifference claim regarding the provision of Ensure.

### B.    Ditropan

Just as there is no evidence that Defendant refused to follow any doctor's orders or treatment plan to provide Plaintiff with Ensure to gain weight or enhance his immune system, there is no evidence suggesting Defendant refused any doctor's order or treatment plan to provide him with Ditropan either. On the contrary, the evidence shows that on December 16, 2022, Plaintiff met with Defendant at ALP Sick Call concerning his bladder cancer and its extension into his prostate. Though Plaintiff was clearly having trouble dealing with his diagnosis and upcoming surgery to remove his bladder and create a urostomy, there is no indication he was experiencing any cancer-related pain. *Id.* ECF 94-2, PageID 781.

On January 4, 2023, Defendant met again with Plaintiff at ALP Sick Call, this time concerning his musculoskeletal back pain. Critically, Defendant ordered Plaintiff Tramadol 50mg TID x 3 days and Flexeril 10mg PO TID PRN x 21 days (will start when med arrives) to treat his back pain. ECF No. 94-2, PageID 785.

Again, on February 7, 2023, Plaintiff met with Defendant at ALP Sick Call concerning a urology telemedicine consult. Though Plaintiff complained about worsening back pain, he made no mention of having bladder spasms. Accordingly, Defendant ordered Plaintiff to be given Tramadol 50mg PO BID x 3 days for his back pain. ECF No. 94-2, PageID 787.

Again, on March 1, 2023, Plaintiff met with Defendant at ALP Sick Call to discuss prospective changes in his forthcoming surgery. Instead of removing Plaintiff's bladder, doctors were now planning to remove the tumor and treat his cancer with chemotherapy. On this visit, not only did Defendant start Plaintiff on Elavil for his back pain, but also Plaintiff reported that Elavil was helpful. ECF No. 94-2, PageID 788.

And on March 16, 2023, Plaintiff met with Defendant at ALP Sick Call following his return from OSU for cystourethroscopy w/fulguration/resection of bladder lesion (TURB) and redo TURP. Reporting everything went well, Plaintiff asked about pain medication. Although Defendant explained that Tramadol and Ditropan would be used as needed for pain and bladder spasms, the record shows that Plaintiff reported neither. ECF No. 94-2, PageID 790-792; PageID 798, Defendant's Ex. C, p. DRC3546-47.

Though Plaintiff met with other non-defendant ALPs, RNs, LPNs, diet technicians, and Health Care Administrators ("HCA") between March 16, 2023, and April 11, 2023, he did not meet with Defendant during this time. Nonetheless, Plaintiff was seen in Nurse Sick Call on March 31, 2023, by a non-defendant nurse who called a non-defendant ALP, Dr. Peppers, who gave verbal orders for Plaintiff to be given Tramadol 100 mg po tid x3 days prn for increased pain and that he be followed up with an ALP the following Monday. Defendant's Ex. C, p. DRC003520, DRC003514.

Accordingly, on April 3, 2023, Plaintiff met with Melissa Hawk, a non-defendant CNP, complaining about intolerable bladder spasms. Critically, this was the first time Plaintiff ever mentioned having bladder spasms, much less suggested any need for Ditropan, a non-formulary medicine which was recommended by OSU on March 16, 2023, for bladder spasms on an "as needed" basis. ECF No. 94-2, PageID 790-792, PageID 798; Defendant's Ex. C, p. DRC3546-47.

8

That same day, CNP Hawk ordered Plaintiff to be provided with Ditropan for 90 days, meaning the order would expire on July 1, 2023. ECF 94-2, PageID 780, PageID 798; Defendant's Ex. C, p. DRC003469, DRC003506-DRC003508.

Three days later, on April 6, 2023, Plaintiff met with a non-defendant diet technician and reported he was having some pain, that new medications had been ordered, and that he had no other concerns. Defendant's Ex. C, p. DRC003498.

Defendant did not meet again with Plaintiff until April 11, 2023. At this ALP Sick Call visit, Plaintiff was not only agitated about his back pain, cancer diagnosis and treatment, kidney pain, his Ditropan being delayed, and his Elavil being discontinued, but also threatening to file a lawsuit. ECF No. 94-2, PageID 800; Defendant's Ex. C, p. DRC003465. Yet, once Defendant explained that his kidney function was normal, his back pain was musculoskeletal and not cancer-related, and that Elavil and Ditropan could not be safely ordered together, Plaintiff decided to stop the Ditropan altogether since he was no longer having bladder spasms (and did not like Ditropan's side effects), thereby allowing Elavil to be prescribed for his back pain. ECF No. 94-2, PageID 801; Defendant's Ex. C, p. DRC003506, DRC003466.

Medical records likewise show that Plaintiff met with Defendant on April 18, 2023, at ALP Chronic Care Visit where he reported that Elavil 50mg QPM was working well for his chronic back pain, no other pain, and no weight loss either. Accordingly, Defendant ordered Plaintiff's current medications to be continued. Defendant's Exhibit C, p. DRC003424-25, DRC003428.

Thereafter, Plaintiff met with Defendant on April 20, 2023, April 27, 2023, May 4, 2023, May 11, 2023, and May 18, 2023, at ALP Sick Call regarding his Bacillus Calmette-Guérin ("BCG") treatments. During that time, Plaintiff declined Tylenol, stating "she said she was going to recommend Cymbalta." Not only was Plaintiff reminded he had just started Elavil pursuant to

his request and that it can take time for the full effect to kick in, but he also refused to say who purportedly recommended Cymbalta, thereby raising concern for ongoing drug seeking behavior. Otherwise, Plaintiff reported nothing more than general fatigue and joint pain at any of these visits. Defendant's Ex. C, p. DRC003396, DRC003373, DRC003333, DRC003263.

Defendant also met with Plaintiff on June 2, 2023, at ALP Sick Call claiming both back pain and that a lump in his scrotum was bothering him. Accordingly, Defendant increased Plaintiff's Elavil to 75mg QPM pursuant to his request. Defendant's Ex. C, p. DRC0003242. Defendant next met with Plaintiff at ALP Sick call on June 8, 2023. Though Plaintiff was worried his cancer was spreading, Defendant reminded him about his history of epididymal cysts, bilateral hydroceles, and that he would be seen again following his upcoming CT scan. Defendant's Ex. C, p. DRC003234. Of further note, despite his persistent complaints about back pain, Plaintiff's compliance with Elavil for June 2023 was just 23%. Defendant's Ex. C, p. DRC003166.

On July 12, 2023, Defendant met with Plaintiff at ALP Chronic Care to discuss his CT scan results and upcoming cystourethroscopy and TURB/TURP. Though Plaintiff claimed he was having to strain with urination, he did not complain about any pain or bladder spasms at this visit. Accordingly, not only did Defendant order that Plaintiff's current medications be continued, but also that he be given Flomax 0.4mg QPM for his straining and dribbling. Defendant's Ex. C, p. DRC003174, DRC003178.

Crucially, the medical records show that the last time Defendant saw Plaintiff was on July 21, 2023, when she saw him at ALP Infirmary Rounds following his July 20, 2023, surgery at OSU for a repeat cystourethroscopy, TURB/TURP, and ureteral stent placement. Notably, on this visit Plaintiff complained of no bladder spasm or pain. Defendant's Ex. C, p. DRC003096-97.  Nor was Defendant aware that Plaintiff's previous order for Ditropan had expired or of any reason for

10

his Ditropan prescription to be renewed. Ex. B, Declaration of Kelli Cardaras, ECF No. 94-2, PageID 778-779. Accordingly, Defendant ordered that Plaintiff's Foley be removed on July 25, 2023, that he be released to his housing unit with a low bunk restriction, that he be given Bactrim DS and Tylenol, that he follow-up with urology in two weeks, and that his previous medications be continued. *Id.* PageID 793-796.

Importantly, a copy of OSU's Discharge Summary concerning Plaintiff's July 20, 2023, surgery was attached to the above-cited medical record. While making no mention of Ensure, the Discharge Summary stated that starting March 16, 2023, Plaintiff was to be given Oxybutynin (Ditropan) 5 MG tablet every 8 hours as needed for Bladder Spasm (mild bladder spasms). ECF No. 94-2, PageID 798. Likewise, the Discharge Summary stated that starting July 20, 2023, Plaintiff was to take 1 tablet by mouth of Oxybutynin CR 10 MG Tab SR 24 HR for fourteen days as needed for bladder spasms. *Id.* PageID 797. It is therefore significant that when Defendant saw Plaintiff on July 21, 2023, not only did he voice no bladder spasm complaints, but also, she ordered that all his previously ordered medications, which would have included OSU's July 20, 2023 order for Ditropan on an as-needed basis, be continued. *Id.*, PageID 794-796. Just as important, even though Plaintiff was transferred to the Madison Correctional Institution on August 2, 2023, Defendant's Ex. C, p. DRC003053, there is no evidence suggesting OSU's previous July 20, 2023, medication orders were not followed while he was at Ross, much less any indication that Defendant refused to do so.

The only other treatment plan in the record is the one issued on July 28, 2023, by Dr. Rifat Elkhatib, Plaintiff's oncologist at OSU. According to Dr. Elkhatib:

1. We discussed since he would not like to proceed with cystectomy at this time the next standard of care option being chemo radiation treatment. I discussed the length of treatment and schedule with the patient.

11

2. We discussed pathology from 3/15/23 which showed invasive urothelial carcinoma We also reviewed CT urogram which was sub-optimal and showed hydronephrosis.
3. Recommend repeat CT of the chest and CT urogram now
4. Refer to Radiation oncology
5. Pain management per local MD
6. Continue following with urology
7. CT scans every three months
8. Recommend Ensure/nutrition supplement for weight loss
9. RTC in 2 months.

ECF No. 96-4, PageID 825. Critically, not only did Dr. Elkhatib recommend Ensure for weight loss only, but also his treatment plan made no mention of Ditropan. *Id.* Moreover, since Dr. Elkhatib's treatment plan was issued well after the last time Defendant treated Plaintiff on July 21, 2023, she would have had no time, opportunity, or occasion to refuse it. Regardless, Dr. Elkhatib made no recommendations regarding medications other than that Plaintiff's pain was to be managed by his local doctors. ECF No. 96-4, PageID 825. And since Defendant ordered on July 21, 2023, that all of Plaintiff's previously ordered medications were to be continued, which was the last time she saw him, ECF No. 94-2, PageID 794-796, there is no evidence suggesting she refused any of Dr. Elkhatib's orders either.

In sum, even though there were concerns regarding Plaintiff's ongoing drug seeking behavior, Defendant's Ex. C, p. DRC003333, rather than Defendant refusing to follow doctor's orders or any treatment plan, not only was Ditropan ordered for Plaintiff on the very first day he complained about having bladder spasms, ECF No. 94-2, PageID 780, PageID 798; Defendant's Ex. C, p. DRC003469, DRC003506-DRC003508, but also his Ditropan was discontinued on April 11, 2023, at his request. ECF No. 94-2, PageID 801. Since there is no evidence that Defendant refused any doctor's orders or treatment plan regarding the provision of Ditropan, she should be awarded summary judgment on Plaintiff's Ditropan claim.

Plaintiff's October 25, 2022, December 26, 2022, January 14, 2023, February 15, 2023, and March 30, 2023 Health Services Requests for painful urination, side and back pain, kidney and back pain, side pain, and side and back pain respectively make no difference to the Court's deliberate indifference analysis since they either precede OSU's March 16, 2023, July 20, 2023, and July 28, 2023 orders and/or have nothing to do with weight loss, immune system enhancement, or bladder spasms. ECF No. 96-6, PageID 828; ECF No. 96-7, PageID 831; ECF No. 96-8, PageID 832; ECF No. 96-9, PageID 834; ECF No. 96-10, PageID 836. Moreover, even if Plaintiff did request to be provided with all the pain medications ordered by OSU doctors, ECF No. 96-1, PageID 820, there are no such orders to be found anywhere in the record other than that Plaintiff may take over-the- counter pain medications as needed. ECF No. 94-2, PageID 797-798. Indeed, although Plaintiff has a long history of arguing about his treatment plan and claiming he is not getting the pain medication and Ensure OSU recommended, Defendant's Ex. C, p. DRC002511, there are no such orders in evidence. Thus, Plaintiff cannot establish the objective component of his deliberate indifference claim. *Heid v. Hooks,* 2020 WL 5201082 at *6 (S.D. Ohio Sept. 1, 2020) (without the presence or threat of actual harm there is no arguable basis for a deliberate indifference claim).

Furthermore, although Plaintiff was seen by non-defendant nurses for pain in his groin at Nurse Sick Call on both July 28, 2023, and July 31, 2023, since he was soon to be transferred, Defendant's Ex. C, p. DRC003053, they referred him to an ALP at the Madison Correctional Institution rather than to Defendant. Accordingly, not only was Plaintiff not seen by Defendant on July 28, 2023, July 31, 2023, or between that time and his transfer on August 2, 2023, but also, she had no reason to suspect he was experiencing any unnecessary pain when all OSU ordered was that he resume all home medications, take over the counter pain medications (Tylenol, ibuprofen)

13

as needed, and take oxybutynin (Ditropan) as needed for bladder spasms (not for pain). *See* ECF No. 94-12, Ex. B, OSU's Discharge Orders attached to the Declaration of Kelli Cardaras, PageID 796.

Thus, a reasonable jury could not conclude that Defendant was deliberately indifferent to the risk that Plaintiff would suffer needless pain after July 21, 2023, which was the last time she saw him following his July 20, 2023 surgery at OSU. *See Canady v. Wilkinson*, 90 F. App'x. 863, 865 (6th Cir. 2004) (citing *Estelle v. Gamble,* 429 U.S. at 104-06) (Any gaps in plaintiff's medical care were at most negligence and did not support a deliberate indifference claim)); *Santiago v. Ringle,* 734 F.3d 585, 592 (6th Cir. 2013) (Awarding defendant summary judgment where there was no evidence that he thought the speed at which the new treatment was provided posed a substantial risk of harm, particularly where the inmate continued to receive the previously-prescribed treatment)). Accordingly, Defendant should also be awarded summary judgment on Plaintiff's Ditropan claim. *Id.*

In sum, even assuming that the objective component of the deliberate indifference test has been met in this case, which it has not, there is no evidence Defendant knew of and disregarded "an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. On the contrary, rather than knowing and disregarding a risk to Plaintiff's health or safety due to a lack of Ditropan and/or Ensure, not only was Plaintiff administered Ditropan, Flexeril, Tramadol, and Elavil while under Defendant's care, but also she tracked Plaintiff's weight and BMI, and she spoke with and arranged for Plaintiff's roundtrip visits with specialists: to a urologist on June 22, 2022 and September 26, 2022; for a CT scan on July 29, 2022; for two Transurethral Resection Prostrate ("TURP") biopsies on November 28, 2022, and December 16, 2022; to an oncologist on April 7, 2023; and for his BCG immunotherapy treatments on April 20, 2023, April 27, 2023, May 4, 2023, May 11, 2023,

and May 18, 2023. *See* ECF No. 94-12. Ex. B, Medical Records attached to the Declaration of Kelli Cardaras, *passim*. For all these reasons, Defendant should be awarded summary judgment on the entirety of Plaintiff's Complaint.

## IV.    Qualified Immunity

"When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007). But rather than establishing a constitutional right to have his doctor's orders followed and that this right was clearly established, both of which are required to contest qualified immunity, *Harris v. City of Circleville*, 583 F.3d 356, 365 (6th Cir. 2009), Plaintiff claims nothing other than that Defendant "is not directly employed by the State of Ohio but is hired through a[n] outside contractor by the State of Ohio from an agency that the Defendant works for and is paid by the agency." ECF No. 96, PageID 817. Although Plaintiff presents no evidence for this contention, he nevertheless concludes that Defendant cannot assert the qualified immunity defense because she was not directly employed by the State of Ohio to provide medical services. ECF No. 96, PageID 817.

Yet, unlike Plaintiff's unsupported allegations, not only has Defendant testified that she is presently employed at Ross as a CNP, but she also testified that she has been employed at Ross in this capacity since 2010. ECF No. 94-2, PageID 777. Furthermore, the record shows that ODRC was and is responsible for recruiting, hiring, and supervising Defendant regarding the medical services she provided Plaintiff. *See* Payroll records of Kelli Cardaras,[1] Defendant's Ex. D, attached. Therefore, since the evidence establishes that Defendant is not privately employed, nor was she privately employed at any time relevant to this litigation, *see Id.*, Payroll records, she most

---

[1] Available online at checkbook.ohio.gov. Last viewed June 8, 2026.

15

certainly has the right to invoke the qualified immunity defense in this action. So, what does qualified immunity provide?

Under the affirmative defense of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 2d 396 (1982). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. Put simply, qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix v. Luna*, 577 U.S. 7, 11-12 (2015) (internal quotation marks omitted). In so doing, the doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

Notably, the Sixth Circuit applies a two-tiered inquiry in reviewing the dismissal of a claim on qualified immunity. *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). The first step is to determine if the facts make out a violation of a constitutional right. The second is to ask if the right at issue was clearly established when the event occurred such that a reasonable officer would have known that his or her conduct violated it. *Harris v. City of Circleville*, 583 F.3d at 365. But in the instant case, since there is no doctor's order or treatment plan recommending that Plaintiff be given Ensure for weight gain or Ditropan for pain, no constitutional right would have been violated even if Plaintiff could establish his remaining allegations. Accordingly, there is no reason for the Court to move on to the second step of the qualified immunity analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

16

Moreover, even if Plaintiff were able to demonstrate that the medical care Defendant provided violated his constitutional rights, to show that she violated established law he must also "identify a case that put her on notice that her specific conduct was unlawful." *Rivas-Villegas v. Cortesluna,* 595 U.S. 1, 142 S. Ct. 4, 8 (2021). To do so, Plaintiff must define the right with particularity "in light of the specific context of the case, not as a broad general proposition," *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (citation omitted), and then identify "existing precedent" that "placed the . . . constitutional question beyond debate," *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). This demanding standard requires Plaintiff to identify a "case that addresses facts like the ones at issue here," *Rivas-Villegas*, 142 S. Ct. at 8, something Plaintiff has made no attempt to accomplish. On the contrary, rather than trying to clear this high bar, Plaintiff instead attempts to lower it by arguing without any evidence that Defendant is ineligible to claim qualified immunity. ECF No. 96, PageID 817.

In sum, since there is no doctor's order or treatment plan recommending Plaintiff be provided with Ensure for weight gain or Ditropan for pain, and since Plaintiff has identified no relevant case law establishing beyond debate that Defendant's failure to provide Plaintiff access to these medications absent a doctor's order or treatment plan was unlawful, Defendant is also entitled to qualified immunity on Plaintiff's deliberate indifference claim.

## V.     Conclusion

For the foregoing reasons, Defendant's motion for summary judgment should be granted.

Respectfully submitted,

D. ANDREW WILSON (0073767)
Ohio Attorney General


s/ *Mindy Worly*
MINDY WORLY (0037395)*
       *Lead Counsel*
D. CHADD MCKITRICK (0073750)
Assistant Attorneys General
Criminal Justice Section
Corrections Litigation Unit
30 East Broad Street, 23rd Floor
Columbus, Ohio 43215
Phone: (614) 728-0161/Fax: (866) 474-4985
Mindy.Worly@OhioAGO.gov
Daniel.McKitrick@OhioAGO.gov

*Counsel for Defendant*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing, *Reply of Defendant Cardaras to Plaintiff's Opposition (ECF 96),* has been electronically filed on June 22, 2026, and was served upon Plaintiff, via U.S. mail, postage prepaid, at the address below:

Lonnie Thompson, #A640-614
Trumbull Correctional Institution
5701 Burnett Road
Leavittsburg, OH 44430

s/ *Mindy Worly*
MINDY WORLY (0037395)
Principal Assistant Attorney General

18