**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**

| | |
|---|---|
| **Lonnie Thompson,** | **Case No. 1:23-cv-01656** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Kelli Cardaras,** | |
| **Defendant.** | **MEMORANDUM OPINION & ORDER** |

Currently pending before the Court is Defendant Kelli Cardaras's ("Defendant" or "Cardaras")[1] Motion for Summary Judgment (the "Motion"). (Doc. No. 94.) *Pro se* Plaintiff Lonnie Thompson ("Plaintiff" or "Thompson") filed his Brief in Opposition ("Opposition") to which Defendant filed her Reply. (Doc. Nos. 96-97.) For the following reasons, Defendant's Motion is GRANTED.

## I. Background

From October 14, 2022 to August 2, 2023, Plaintiff was incarcerated at Ross Correctional Institution ("RCI").[2] Plaintiff suffers from bladder cancer, and Cardaras is a Certified Nurse Practitioner who treated him for this condition while Plaintiff was incarcerated at RCI. (Declaration of Kelli Cardaras (Doc. No. 94-2), ¶ 2, PageID# 777) (hereinafter "Cardaras. Decl."). Cardaras testified that she began seeing Plaintiff as a patient in November 2022. (*Id.*, ¶ 2.) On October 25,

---

[1] The Amended Complaint refers to Kelli Cardaras as "Cadaras," but the Court refers to her as "Cardaras," which is the spelling Defendant uses in the Motion. (*Compare* Doc. No. 57 at PageID# 412 *with* Doc. No. 94 at PageID# 746.)

[2] Plaintiff was transferred from RCI to Madison Correctional Institution on August 2, 2023. (Doc. No. 97-1, PageID# 858.)

2022, Plaintiff filed a Health Services Request complaining of blood in his urine and pain with urination and requesting pain medication. (Doc. No. 96-6, PageID# 828.) Thompson relayed that he had turned in his refill request about nine (9) days prior. (*Id.*)

Plaintiff underwent two Transurethral Resection Prostrate ("TURP") biopsies on November 28 and December 16, 2022. (Cardaras Decl., ¶ 13.) On December 1, 2022, Thompson submitted a grievance inquiring about his biopsy results. (Doc. No. 94-1, PageID# 764.) RCI staff responded by scheduling him a follow up appointment with Urology for December 14th. (*Id.*) The medical record associated with a December 16, 2022 visit with Cardaras noted that Plaintiff was there "for [follow-up] after urology telemed" and that the pathology from the biopsy indicated that Plaintiff was suffering from bladder cancer with extension into the prostate. (Doc. No. 94-2, PageID# 781.) At that appointment, he weighed 165 pounds. (*Id.*)

Five days later, on December 21, 2022, Plaintiff filed a grievance, asserting he had "filled out two Inmate Health Care Requests in the last week and [had not] been placed on either nurses' sick call or doctors' sick call."[3] (Doc. No. 94-1, PageID# 765.) In those requests, he complained of severe pain in his lower back and side. (*Id.*) He closed his own grievance later that evening as the record indicates that he was seen for his back pain by another ALP the following day, December 22, 2022. (*Id.*; Doc. No. 94- 2, PageID# 783.)[4]

Four days later, on December 26, 2022, Plaintiff made a Health Services Request for extreme side and back pain which he asserts went unresolved. (Doc. No. 96-7, PageID# 831; Doc. No. 96, PageID# 816.) On January 3, 2023, Plaintiff filed a grievance, writing that he was supposed to see

---

[3] At RCI, inmates place health services requests to be seen by an Advanced Level Providers (ALP). (Cardaras Decl., PageID# 777.) Cardaras is an ALP. (*Id.*)

[4] The record does not indicate whether Plaintiff was prescribed pain mediation at this appointment.

Cardaras for a follow up appointment the prior week. (Doc. No. 94-1, PageID# 766.) He closed this grievance later that evening as the record shows that he met with Cardaras the next day. (*Id.*) During this visit, Cardaras noted his complaint of back pain and placed an order for Tramadol, an opioid used to treat pain, 50 mg three times a day for three days, and Flexeril, a muscle relaxant, 10 mg three times a day for twenty-one days as needed. (Doc. No. 94-2, PageID#s 783-85.) At this January 4, 2023 appointment, he weighed 162 pounds. (*Id.*)

A week later, on January 11, 2023, Plaintiff filed a grievance, complaining of chronic pain in his kidney and lower back. (Doc. No. 94-1, PageID# 767.) RCI staff directed him to file a health services request. (*Id.*) On January 13, 2023, Plaintiff filed another Health Services Request regarding his kidney and back pain, and side pain and indicating that he needed some pain medicine. (Doc. No. 96-8, PageID# 832.)[5] On February 7, 2023, he saw Cardaras for a follow-up visit after his urology telemed in which he discussed his upcoming bladder surgery. (Doc. No. 94-2, PageID#s 786-87.) During this visit, Cardaras noted that he complained of back pain and again placed an order for Tramadol, 50 mg three times a day for three days, and Flexeril, 10 mg three times a day for twenty-one days as needed. (*Id.*) At this appointment, he weighed 172 pounds. (*Id.*)

On February 15, 2023, Plaintiff made a Health Services Request because his sides were hurting more and he asked to have his surgery "soon before the pain becomes unbearable." (Doc. No. 96-9, PageID# 834.) On March 1, 2023, Plaintiff met with Cardaras to discuss changes regarding his upcoming bladder surgery. (Doc. No. 94-2, PageID# 788.) Plaintiff declined surgery to remove his bladder, so the care team instead planned to resect the tumor. (*Id.*) Plaintiff reported that he had

[5] The record indicates that Plaintiff's height and weight were recorded on February 2, 2023. (Doc. No. 94-2, PageID# 786.)

been prescribed Elavil,[6] an antidepressant used to treat mental health conditions and sometimes nerve pain, which he had found helpful. (*Id.*) At this appointment, he weighed 181 pounds. (*Id.*)

On March 15, 2023, Plaintiff underwent surgery on his bladder at Ohio State University ("OSU") Hospital. (Doc. No. 96-4, PageID# 825.) After being discharged from the hospital, on March 16, 2023, Plaintiff met with Cardaras. (Doc. No. 94-2, PageID#s 790-92.) The appointment notes from this visit include the following: "Released to housing unit with Foley cath[eter], may switch to leg bag. [Patient education] on Bactrim DS[, an antibiotic,] to start 1 day before cath[eter] removal next week, handout provided on catheter care and explained, Ditropan and Tramadol for pain/spasms. [Follow up] in 2 weeks ..." (*Id.*)

On March 21, 2023, Plaintiff filed a grievance, stating that he did not receive adequate pain medication from Cardaras. (Doc. No. 94-1, PageID# 768.) Plaintiff pointed out that he was prescribed Elavil for pain, which targets mental health conditions and pain, but he wrote that he was still experiencing mental health issues and needed pain medication for his ongoing neck and back pain. (*Id.*, PageID# 769.) On March 24, 2023, Mike Scott responded to Plaintiff that he would reach out to him to speak more on Elavil and would address the concerns Plaintiff had about not receiving Ditropan, which Plaintiff included in a separate grievance filed that same day. (*Id.*, PageID# 770, 772.) On March 27, 2023, Plaintiff responded:

> My problem with the medical staff not giving me my medicine that the Ohio State University Doctor Dascen ordered for me after my surgery, Ditrop[an] was a total neglect on their behalf concerning my proper medical care. I inquired about this medication numerous times during the times I went to pill call. The nurse(s) always advised me that the order hadn't c[o]me in. Knowing that my institutional medical file went down to OSU and certainly came back with the order from the doctor that did the operation. Also, I only received three (3) days of pain medicine. The Nurse Practi[ti]oner, Cardaras had me taken off of my mental health medication, Remron

[6] The record does not indicate who prescribed Elavil, but the appointment notes indicate that Plaintiff's height and weight were recorded on February 27, 2023. (Doc. No. 94-2, PageID# 788.)

> due to the fact that she only wanted to give me Elavil, which has a dual purpose for pain and mental health. The problem is that she only gave it to me for (4) four or (5) days. Cardaras never did a follow up after my surgery to explain or know any of my post surgery problems. I am still bleeding when I urinate and the pain is extreme throughout the day. I have cancer and I don't receive any pain medicine for my pains. The resolution to solve this is to give me pain medicine that will at least ease the pain and allow me to take my mental health medicine also. I also want something done for the medical staff dropping the ball on my medication not being given to me at the time it was supposed to have been given. This should never happen ever again to me due to the fact that I still have to have treatment for this cancer[.]

(*Id.*) On April 19, 2023, Todd Diehl responded that Cardaras followed up with him the day he returned from OSU,[7] Elvail could not be prescribed alongside Remeron and Ditropan, and the prescription for Ditropan was prescribed on March 16, 2023, but RCI did not receive the medication until April 5, 2023. (*Id.*) Diehl noted that this delay was "determined an excessive amount of time and [Health Care Administrator] and [Continuous Quality Improvement] nurse were notified. Correction to this discovery was made immediately by those staff members." (*Id.*) Diehl further remarked that Plaintiff met with Cardaras and Health Care Administrator Scott on April 11, 2023 and stated that Plaintiff's complaints were resolved then. (*Id.*) Plaintiff responded and reiterated his request for pain medication. (*Id.*) On May 19, 2023, Karen Stanforth, the Office of the Chief Inspector, reviewed this grievance and affirmed it. (*Id.*, PageID# 768.) She noted that Plaintiff bore some responsibility because he did not fill out a health service request until two weeks after the prescription was issued. (*Id.*, PageID# 769.) However, Plaintiff claims that he inquired about the missing medication several times in the intervening weeks at pill call. (*Id.*, PageID# 770.)

On March 31, 2023, Plaintiff was seen by another ALP, Dr. Peppers, who gave verbal orders for Plaintiff to be given Tramadol 100 mg three times a day for three days as needed for increased

[7] In his response to Plaintiff's grievance, Diehl indicates that Plaintiff returned from OSU on March 13, 2023, but other records indicate that he was discharged on March 16, 2023. (*Compare* Doc. No. 94-1, PageID#s 769-70; *with* Doc. No. 94-2, PageID#s 790-92.)

pain and noted that another ALP would follow up with him on Monday. (Doc. No. 97-1, PageID# 882-83.) On April 3, 2023, Plaintiff met with ALP, Certified Nurse Practitioner Melissa Hawk, and complained of bladder spasms. (Doc. No. 94-2, PageID# 780.) She approved a prescription for 5 mg of Ditropan for 90 days. (*Id.*)[8]

On April 6, 2023, Plaintiff met with a diet technician and reported he was having some pain, that new medications had been ordered, and that he had no other concerns. (Doc. No. 97-1, PageID# 877.) That same day, Plaintiff filed a grievance about being placed back on Elavil. (Doc. No. 94-1, PageID# 773.) On April 7, 2023, Plaintiff met with oncology. (Doc. No. 97-1, PageID# 877.) On April 11, 2023, Plaintiff met with Cardaras. (Doc. No. 94-2, PageID# 800.) At the appointment, Plaintiff complained of kidney pain and mental health issues. (*Id.*) He explained that he was upset that his Ditropan prescription was delayed and that his Elavil was not reordered.[9] (*Id.*) Plaintiff explained he is no longer having bladder spasms and asked to stop the medication because it made him feel funny and caused him to have a dry mouth. (*Id.*, PageID# 801.)[10] Plaintiff decided to stop the Ditropan altogether since he was no longer having bladder spasms. (*Id.*) Thus, Cardaras reordered Elavil, and Plaintiff's April 6th grievance was closed. (Doc. No. 94-1, PageID# 773.) At the time of the appointment, he weighed 181 pounds. (*Id.*) On April 18, 2023, Plaintiff met with Defendant, where he reported that Elavil 50mg was working well for his chronic back pain and his

[8] The appointment notes indicate that Plaintiff had returned from OSU Hospital that day. (Doc. No. 94-2, PageID# 780.)

[9] The appointment notes indicate that he had received Ditropan by the time of this appointment. (Doc. No. 94-2, PageID# 800.)

[10] The appointment notes also provide that "the Ditropan was intended for use while catheterized as it can cause urinary retention." (Doc. No. 94-2, PageID# 801.)

weight remained unchanged, at 181 pounds. (*Id.*) Cardaras ordered that Plaintiff's current medications be continued. (Doc. No. 97-1, PageID#s 871-73.)

From April 27, 2023 to June 2, 2023, Plaintiff met with Cardaras several times for Bacillus Calmette Guerin ("BCG") immunotherapy treatment for bladder cancer. (Doc. No. 97-1, PageID#s 868-70.) During one visit, the appointment notes indicate that Plaintiff declined Tylenol, stating "she said she was going to recommend Cymbalta." (*Id.*, PageID# 868.) Cardaras reported that she did not know who "she" was but reminded Plaintiff he had just started Elavil, which can take time to work. (Doc. No. 97-1, PageID#s 868-70.) Cardaras noted "concern for ongoing drug seeking behavior." (*Id.*)

On June 2, 2023, Plaintiff met with Defendant claiming both back pain and that he was bothered by a lump in his scrotum. (*Id.*, PageID# 865.) Accordingly, Defendant increased Plaintiff's Elavil to 75mg QPM pursuant to his request. (*Id.*)[11] On June 16, 2023, Plaintiff filed a grievance about the (1) unresolved health requests he filed as a result of his pain and (2) that he had not received a pass for his upcoming CT scan. (Doc. No. 94-1, PageID# 774.) On June 23, 2023, Mike Scott wrote that he reviewed Plaintiff's test and chart with Plaintiff, and Plaintiff accepted this response. (*Id.*)

On July 12, 2023, Plaintiff met with Cardaras to discuss the results of his CT scan and upcoming bladder surgery. (Doc. No. 97-1, PageID#s 862-63.) Since Plaintiff declined to have surgery removing his bladder, doctors planned to operate again and resect the tumor. (*Id.*, PageID#s 862-63.) Cardaras ordered that Plaintiff continue his current medication but add Flomax 0.4mg, to

[11] Cardaras asserts that she met with Plaintiff on June 8, 2023 to address his concerns that his cancer was spreading. (Doc. No. 97-1, PageID# 864.) The name of the practitioner conducting the visit is not included on this document, so this Court cannot verify that this meeting was with Cardaras.

aid straining and dribbling during urination. (*Id.*) At the appointment, Plaintiff weighed 170 pounds. (*Id.*) On July 20, 2023, Plaintiff underwent surgery. (Doc. No. 94-2, PageID#s 797-98.) The discharge instructions directed him to resume all home medications, take over the counter medications as needed, and take oxybutynin as needed for bladder spasms.[12] (*Id.*)

On July 21, 2023, Cardaras met with Plaintiff for the final time during infirmary rounds while he was in the OSU hospital recovering from his procedure. (Doc. No. 94-2, PageID#s 778-79.) At the appointment, he weighed 173 pounds. (*Id.*) Cardaras ordered Plaintiff's Foley catheter be removed by July 25, 2023, he be released to his housing unit with a low bunk restriction, he be given Bactrim DS and Tylenol, he follow-up with urology in two weeks, and that his previous medications be continued. (*Id.*, PageID#s 793-96.) On July 28, 2023, Plaintiff was seen by Dr. Elkatib, Plaintff's oncologist, who recommended that Plaintiff take a nutritional supplement. (Doc. No. 96-4, PageID# 825.)[13] On August 2, 2023, Plaintiff was transferred from RCI to Madison Correctional Institution. (Doc. No. 97-1, PageID# 858.)

## II. Procedural History

Plaintiff, proceeding *pro se*, filed his Complaint against Defendants Julie Christine Hensley, Kendra Lynn Newland, Dr. Ifeoma Ada Chinweoke Ojukwu, Rachael Elizabeth Wheeler, Sherry Lynn Cornwell, and Cardaras (together, "Defendants") on August 25, 2023. (Doc. No. 1.) On May 28, 2024, the Court appointed Attorney Joseph T. Sobecki as pro bono counsel for Plaintiff. (Doc. No. 23.) On December 20, 2023, this Court referred the case to Magistrate Judge Grimes for pretrial supervision. (Doc. No. 6.) On January 10, 2025, Plaintiff, through counsel, filed his Amended

[12] Ditropan is the brand name for Oxybutynin.

[13] Defendant argues that on July 31, 2023, Plaintiff was seen by an ALP who was not Defendant. (Doc. No. 97, PageID# 851.) This Court cannot verify this visit with the record.

Complaint. (Doc. No. 57.) On March 3, 2025, the Court granted Sobecki leave to withdraw as Plaintiff's counsel. (Doc. No. 60.) *See* Non-Doc. Order dated March 3, 2025.

In his Amended Complaint, Plaintiff asserted a deliberate indifference claim under 28 U.S.C. § 1983 against each of the named Defendants, in their personal capacities, for violating his right to be free from cruel and unusual punishment under the Eighth Amendment and the Fourteenth Amendment. (Doc. No. 57, PageID#s 408-16.) On April 25, 2025, Defendants filed their Motion to Dismiss. (Doc. No. 70.) On June 24, 2025, Plaintiff filed his Motion in Opposition to Defendants' Motion to Dismiss. (Doc. No. 74.) On June 26, 2025, Defendants filed their Motion to Strike and Reply to Plaintiff's Belated Opposition Reply. (Doc. No. 75.) On October 30, 2025, this Court issued its MOO, granting in part and denying in part Defendants' Motion to Dismiss. (Doc. No. 80.) In the Order, the Court dismissed Plaintiff's claims against Hensley, Newland, Dr. Ojukwu, Wheeler, and Cornwell but declined to dismiss Plaintiff's claim against Cardaras. (Doc. No. 80, PageID# 645.) On December 4, 2025, Plaintiff filed a Motion for Reconsideration requesting that the Court reconsider its decision in the October 30, 2025 Memorandum Opinion and Order. (Doc. No. 84.) On March 4, 2026, this Court denied the Motion for Reconsideration. (Doc. No. 92.)

On March 31, 2026, Cardaras filed the Motion. (Doc. No. 94.) On June 5, 2026, Plaintiff filed his Opposition to which Cardaras replied on June 22, 2026. (Doc. Nos. 96-97.) Thus, the Motion is ripe for this Court's review.

## III. Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir.

2006) (citing *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 451 (6th Cir. 2004)). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487 (citing *Hedrick*, 355 F.3d at 451).

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 628 (6th Cir. 2018) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "[T]he moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc.*, 593 Fed. Appx 506, 508 (6th Cir. 2014) (citing *Anderson*, 477 U.S. at 256). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx 758, 764 (6th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id.* (quoting *Celotex*, 477 U.S. at 325).

Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems.*, 593 Fed. Appx at 508–09 (citing *Anderson*, 477 U.S. at 256). "[T]he nonmoving party may not simply rely on its pleading but must 'produce evidence that results in a conflict of material

fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc.*, 101 F. Supp.3d 731, 736 (N.D. Ohio 2015) (quoting *Cox*, 53 F.3d at 150).

## IV. Analysis

### a. Failure to Exhaust

Cardaras argues that Plaintiff failed to exhaust his claims against Defendant in accordance with the Prison Litigation Reform Act ("PLRA"). (Doc. No. 94, PageID# 748.) She contends that "Plaintiff needed to complete the administrative grievance process established by the Ohio Department of Rehabilitation and Correction ('ODRC') before he filed his complaint." (*Id.*) Cardaras points out that ignorance of the grievance process is not an excuse. (*Id.*) She argues that "Plaintiff's grievance history reveals that he never filed an administrative grievance against Defendant Cardaras." (*Id.*, PageID# 750.) In the Affidavit of Plaintiff Lonnie Thompson attached as an exhibit to the Opposition, Plaintiff avers that he did exhaust his administrative remedies to the highest level. (Doc. No. 96-3, PageID# 823.) He points out that the Declaration of Assistant Chief Inspector Roberta Murphy (hereinafter "Murphy Declaration") attached as an exhibit to the Motion acknowledges that his grievances advanced to appeal. (*Id.*) (citing Doc. No. 94-1.) In the Reply, Defendant argues that "Plaintiff submitted only one Informal Complaint Resolution that advanced to a Notice of Grievance and then to appeal concerning the medical care he received from Defendant." (Doc. No. 97, PageID# 841.) Defendant contends that "that grievance was directed at Plaintiff's mental health medications being interrupted so he could receive pain medication and a delay in his Ditropan due to an access and distribution issue within the institution pill room rather than any action taken by Defendant to refuse Plaintiff Ditropan, follow his doctor's orders, or adhere to his treatment plan." (*Id.*) This Court will address these arguments in turn below.

"The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). "Failure to exhaust is an affirmative defense." *Doe v. Snyder*, 945 F.3d 951, 961 (6th Cir. 2019) (citing *Jones*, 549 U.S. at 216). Defendant bears the burden of proof. *Id.* (citation omitted). A prisoner must make "affirmative efforts to comply with the administrative procedures," and a court should analyze whether those efforts "were sufficient under the circumstances." *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011) (citation omitted).

A court should grant summary judgment for failure to exhaust "only if a defendant establishes that there is no genuine dispute of material fact that the plaintiff failed to exhaust." *Id.* (citation omitted). Cardaras has not shown how Plaintiff's March 21st and 24th grievances failed to comply with the prison's grievance requirements. The Murphy Declaration outlines this grievance process. *See* (Doc. No. 94-1.)

"At step one of the process, the [Incarcerated Person (IP)] submits an informal complaint (ICR) to the direct supervisor of the staff member or the department most directly responsible over the subject matter concerning the IP within fourteen (14) calendar days of the date of the event giving rise to the complaint." (*Id.*, PageID#s 761-62.) Ohio Administrative Code Rule 5120-9-31 provides the grievance procedure for Ohio prisons. It requires that prisoner complaints "contain specific information; dates, times, places, the event giving rise to the complaint and, if applicable, the name or names of personnel involved and the name or names of any witnesses." O.A.C. R. 5120-9-31(J). The Code does not require that the prisoner's complaint contain a specific legal claim.

On March 21, 2023, Plaintiff filed a grievance about Cardaras. Therein, he claimed that he

did not receive adequate pain medication from Cardaras. (Doc. No. 94-1, PageID# 768.) Plaintiff pointed out that he was prescribed Elavil for pain, which targets mental health conditions and pain, but he wrote that he was still experiencing mental health issues and needed pain medication for his ongoing neck and back pain. (*Id*., PageID# 769.) On March 24, 2023, Plaintiff filed a separate grievance where he claimed that he had not received Ditropan. (*Id*., PageID# 772.)

After an incarcerated person files their complaint, "[s]taff will investigate the matter and issue a written response to the IP's informal complaint within seven (7) calendar days of the receipt of the ICR." (Murphy Decl., PageID# 762.) On March 24, 2023, Mike Scott responded to Plaintiff that he would reach out to him to speak more on Elavil and would address the concerns Plaintiff had about not receiving Ditropan. (Doc. No. 94-1, PageID# 770, 772.) "If the IP is not satisfied with the response to the ICR, the IP must proceed to the second step of the process by filing a formal Notification of Grievance (NOG) with the Inspector of Institutional Services at the prison where he is confined, or where the subject of the grievance has occurred if the IP has thereafter been transferred to another institution." (Murphy Decl., PageID# 762.) On March 27, 2023, Plaintiff responded that Cardaras had not sent in the prescription for Ditropan, did not prescribe sufficient Elavil, and did not follow up with him after the procedure. (Doc. No. 94-1, PageID#s 770, 772.)

Next, within fourteen (14) calendar days, "the Inspector of Institutional Services shall issue a written response to the IP's grievance on a Disposition of Grievance (DOG) form." (Murphy Decl., PageID# 762.) On April 19, 2023, Todd Diehl responded and explained that Cardaras followed up with him the day he returned from OSU, Elvail could not be prescribed alongside Remeron and Ditropan, and the prescription for Ditropan was prescribed on March 16, 2023, but RCI did not receive the medication until April 5, 2023. (Doc. No. 94-1, PageID# 769.) Diehl notes that this

delay was "determined an excessive amount of time and [Health Care Administrator] and [Continuous Quality Improvement] nurse were notified. Correction to this discovery was made immediately by those staff members." (*Id.*)

Next, "[i]f the IP is still dissatisfied, the IP must proceed to the third step of the process by filing an appeal to the ODRC Office of the Chief Inspector within fourteen (14) calendar days of receiving the disposition of his grievance (DOG)." (Murphy Decl., PageID# 762.) "The Office of the Chief Inspector will investigate and provide the IP with a written response to the IP's appeal within thirty (30) calendar days of the receipt of the appeal." (*Id.*) Plaintiff responded to Diehl and reiterated his request for pain medication. (*Id.*) On May 19, 2023, Karen Stanforth, the Office of the Chief Inspector, reviewed this grievance and affirmed it. (*Id.*, PageID# 768.) She noted that Plaintiff bore some responsibility because he did not fill out a health service request until two weeks after the prescription was issued. (*Id.*, PageID# 769.) However, Plaintiff claims that he inquired about the missing medication several times in the intervening weeks at pill call. (*Id.*, PageID# 770.) The Court therefore concludes that there is a genuine dispute of material fact about whether Plaintiff failed to exhaust his administrative remedies as to Plaintiff's mood and medication management and the delayed Ditropan. However, nowhere in these exchanges does Plaintiff mention Cardaras's alleged failure to prescribe him a nutritional supplement and according to the record, [14] he did not file a grievance regarding the Ditropan ordered after his July 20, 2023 procedure. So, these issues have not

[14] As Cardaras points out, even if Plaintiff had exhausted the issue of Defendant's alleged failure to prescribe him a nutritional supplement like Ensure, Plaintiff's lowest recorded weight during his visits with Defendant was 162 pounds. (Doc. No. 94-2, PageID# 783.) So with a height of 69 inches or 5'7", Plaintiff's body mass index (BMI) would be considered overweight, which cuts against Plaintiff's argument that Defendant acted with deliberate indifference by failing to prescribe him a nutritional supplement. (*Id.*, PageID#s 783-85.) Furthermore, it was not until July 23, 2023 when Dr. Elkatib, Plaintff's oncologist, recommended that Plaintiff take a nutritional supplement that this matter was raised. (Doc. No. 96-4, PageID# 825.) This date falls after Plaintiff's final visit with Defendant on July 21, 2023. (Doc. No. 94-2, PageID# 778-79.)

been exhausted. Nonetheless, because the Court has also concluded that there is no genuine dispute of material fact about Plaintiff's substantive claim, this does not change the Court's ultimate ruling in favor of Cardaras.

**A. Deliberate Indifference**

This Court must now determine whether Cardaras acted with deliberate indifference when managing Defendant's pain and mental health medication and when Plaintiff was unable to obtain his prescription for Ditropan after the March surgery. (Doc. No. 94, PageID# 753.) In the Motion, Cardaras argues that Plaintiff has not shown that Defendant objectively acted with deliberate indifference to his needs and notes that Plaintiff was prescribed pain and medical health medication and eventually received Ditropan. (*Id.*, PageID# 752.) As to the subjective component of the deliberate indifference test, Cardaras contends that she did not disregard a risk to Plaintiff's health and rather prescribed Plaintiff the medication he requested.

In the Opposition, Plaintiff first argues that Defendant's contentions are not properly supported. (Doc. No. 96, PageID# 809.) Second, he asserts that he satisfies the objective component of this test because he claims he suffered improper treatment during his battle with cancer, which poses a serious harm to his health. (*Id.*) Third, he asserts that Cardaras did not follow "doctor ordered medications and treatment for the Plaintiff" and the Ditropan prescription was not given to Plaintiff until four weeks after his surgery. (*Id.*) Plaintiff then goes on to list the evidence supporting his claim and explains that Defendant refused to provide him with pain medication. (*Id.*)

In the Reply, Cardaras first argues that "there is no evidence suggesting she refused any doctor's order or treatment plan to provide him with Ditropan." (Doc. No. 97, PageID# 845.) Analyzing the records from various appointments, Cardaras also points out there are no orders from

OSU doctors which she violated. (*Id.*) The Court will address these arguments in turn below.

The Eighth Amendment protects all people from "cruel and unusual punishments." U.S. Const. amend. VIII. "'[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.'" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Helling v. McKinney*, 509 U.S. 25, 31 (1993)). The Eighth Amendment therefore imposes a duty on prison officials to provide humane conditions of confinement by "ensur[ing] that inmates receive adequate food, clothing, shelter, and medical care" and taking "reasonable measures to guarantee the safety of the inmates." *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984). "A prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer*, 511 U.S. at 828 (citing *Helling*, 509 U.S. at 31). Failure to provide adequate medical treatment to a prisoner violates the Eighth Amendment's prohibition against cruel and unusual punishment only when it results from "deliberate indifference" to the prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

"To establish a prison official's deliberate indifference to a serious medical need, an inmate must show two components, one objective and the other subjective." *Rhinehart v. Scutt*, 894 F.3d 721, 737 (6th Cir. 2018) (citing *Farmer*, 511 U.S. at 834). "The plaintiff must show both that the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and that the official acted with a culpable enough state of mind, rising above gross negligence." *Id.* "A doctor's errors in medical judgment or other negligent behavior do not suffice to establish deliberate indifference." *Id.* (citing *Estelle*, 429 U.S. at 107-08.)

As to the subjective component, "the plaintiff must show that [the] defendant acted with a mental state 'equivalent to criminal recklessness.'" *Id.* (citing *Santiago v. Ringle*, 734 F.3d 585, 591

(6th Cir. 2013) (citing *Farmer*, 511 U.S. at 834, 839-40). "This showing requires proof that [the] defendant 'subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk' by failing to take reasonable measures to abate it." *Id.* (citation omitted). "[T]he plaintiff also must present enough evidence from which a jury could conclude that each defendant 'so recklessly ignored the risk that he was deliberately indifferent to it.'" *Id.* (quoting *Cairelli v. Vakilian*, 80 F. App'x 979, 983 (6th Cir. 2003)). "A doctor is not liable under the Eighth Amendment if he or she provides reasonable treatment, even if the outcome of the treatment is insufficient or even harmful." *Id.* "[T]here is a high bar that a plaintiff must clear to prove an Eighth Amendment medical-needs claim: The doctor must have '*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm.'" *Id.* at 738-39 (quoting *Richmond v. Huq*, 885 F.3d 928, 940 (6th Cir. 2018) (emphasis added) (citation and internal quotation marks omitted)).

This Court has found that genuine issues of material fact preclude this Court from determining as a matter of law that Plaintiff failed to exhaust his March 21st and 24th grievances related to his pain and mental health medication management as well as the delay in providing him with Ditropan. Since a grievance must be filed within fourteen days after the event occurs, this Court needs to only examine Plaintiff's claims as they relate to events beginning on March 6, 2023. Even so, this Court points out that the record indicates that Cardaras did prescribe Plaintiff medication for his pain and mental health issues even in the months preceding March 2023.

On December 26, 2022, Plaintiff made a Health Services Request for side and back pain. (Doc. No. 96-7, PageID# 831.) On January 3, 2023, Plaintiff filed a grievance, writing that he was supposed to see Cardaras for a follow up appointment. (Doc. No. 94-1, PageID# 766.) The following

day, he met with Cardaras, and she placed an order for Tramadol, an opioid used to treat pain, 50 mg three times a day for three days, and Flexeril, a muscle relaxant, 10 mg three times a day for twenty-one days as needed. (Doc. No. 94-2, PageID#s 783-85.) Plaintiff does not dispute being prescribed those medications on this date.

A week later, on January 11, 2023, Plaintiff filed a grievance, complaining of chronic pain in his kidney and lower back. (Doc. No. 94-1, PageID# 767.) RCI staff directed him to file a Health Services Request. (*Id.*) On January 13, 2023, Plaintiff filed a Health Services Request regarding his kidney and back pain, and side pain. (Doc. No. 96-8, PageID# 832.) On February 7, 2023, he met with Cardaras and, during this visit, Cardaras noted that he complained of back pain and again placed an order for Tramadol, 50 mg three times a day for three days, and Flexeril, 10 mg three times a day for twenty-one days as needed. (Doc. No. 94-2, PageID#s 786-87.) Plaintiff does not dispute being prescribed medication on this date.

About a week later, on February 15, 2023, Plaintiff made a Health Services Request for side pain. (Doc. No. 96-9, PageID# 834.) On March 1, 2023, Plaintiff met again with Cardaras and reported that he had been prescribed Elavil by another ALP, an antidepressant used to treat mental health conditions and sometimes nerve pain, which he had found helpful. (*Id.*) In the Opposition, Plaintiff argues that "no pain medications were provided" and references the record in support. (Doc. No. 96, PageID# 814; Doc. No. 94-1, PageID# 788.) However, he does not deny that he started taking Elavil nor did he assert that he requested a refill of that prescription at that appointment which Cardaras denied.

As to the Ditropan, after being discharged from OSU hospital after his surgery, on March 16, 2023, Plaintiff met with Cardaras. (Doc. No. 94-2, PageID#s 790-92.) The appointment notes from

this visit include the following: "Released to housing unit with Foley cath[eter], may switch to leg bag. [Patient education] on Bactrim DS[, an antibiotic,] to start 1 day before cath[eter] removal next week, handout provided on catheter care and explained, Ditropan and Tramadol for pain/spasms. [Follow up] in 2 weeks ..." (*Id.*) Plaintiff asserts that Cardaras did not follow "doctor ordered medications and treatment for the Plaintiff" and the Ditropan prescription was not given to Plaintiff until four weeks after his surgery. (*Id.*) Yet, in support of his March grievances, he wrote that "my problem with the medical staff not giving me my medicine that the Ohio State University Doctor Dascen ordered for me after my surgery, Ditrop[an] was a total neglect on their behalf concerning my proper medical care." (Doc. No. 94-1, PageID# 770.)

Plaintiff has provided no support that he did not receive Ditropan because of Cardaras. In fact, his grievance indicates that he expected Dr. Dascen to order the prescription. This Court sympathizes with Plaintiff. Cardaras, who attributes the delay to a distribution error, even concedes that the delay was deemed "an excessive amount of time." (*Id.*, PageID# 770.) Even if Plaintiff disputed, which he does not appear to do, Defendant's reasoning that a distribution error caused the delay, there is no evidence in the record that suggests that Cardaras "*consciously* expos[ed] the patient to an *excessive* risk of *serious* harm.'" *Richmond*, 885 F.3d at 940.[15]

As to why Plaintiff did not have access to Elavil following the surgery, Cardaras explained that Elavil could not safely be ordered with the mental health medication he was previously on or with Ditropan because they cause urinary retention. (Doc. No. 94-2, PageID# 800.) In fact, on April 7, 2023, Cardaras advised Plaintiff that the Elavil could not be safely ordered because he was on

[15] Plaintiff did eventually receive Ditropan on April 5, 2023, but the Court acknowledges that the need for Ditropan had likely waned because "Ditropan was intended for use while catheterized as it can cause urinary retention" and Plaintiff's catheter was removed a week after the procedure. (Doc. No. 94-2, PageID#s 790-92, 801.)

Ditropan and that Ditropan was intended for use while catheterized as it can cause urinary retention and then Plaintiff admitted that he was no longer having bladder spasms and his urination was normal. Plaintiff also advised Cardaras that he wanted to stop the Ditropan altogether because it makes him feel fumy and have dry mouth. All of which prompted Cardaras to reorder the Elavil, which Plaintiff does not dispute. (*Id.*, PageID# 801.)

Plaintiff argues that on April 19, 2023, he told staff that Cardaras refused to provide him with pain medication. (Doc. No. 96, PageID# 815) (citing (Doc. No. 94-1, PageID# 769.) However, on April 18, 2023, Plaintiff met with Cardaras and reported that Elavil 50mg was working well for his chronic back pain and Cardaras ordered that Plaintiff's current medications be continued. (Doc. No. 94-1, PageID# 773; Doc. No. 97-1, PageID#s 871-73.) When communicating with staff, Plaintiff does not deny that he was taking Elavil. (*Id.*) Instead, he notes only that Elavil was ineffective for his pain. (*Id.*)

The undisputed material facts demonstrate that Cardaras did not act with a mental state equivalent to criminal recklessness so as to meet the subjective component of a deliberate indifference claim. Having so found, this Court need not analyze whether Plaintiff's claim satisfies the objective component.[16] For these reasons, the Court grants summary judgment in favor of Defendant and against Plaintiff as to Plaintiff's deliberate indifference claim.

[16] Furthermore, this Court need not address the parties' arguments as to qualified immunity, finding that Plaintiff's claim fails for the reasons stated herein.

## V. Conclusion

For the reasons set forth herein, the Motion for Summary Judgment (Doc. No. 94) is granted.

**IT IS SO ORDERED.**

*s/Pamela A. Barker*
PAMELA A. BARKER
U.S. DISTRICT JUDGE

Date: November 19, 2026